[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 11 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 12 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 13 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 14 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 15 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 16 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 17 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 18 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 19 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 20 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 21 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 22 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 23 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 24 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 25 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 26 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 27 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 28 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 29 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 30 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 31 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 32 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 33 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 34 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 35 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 36 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 37 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 38 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 39 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 40 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 41 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 42 
It will be convenient to approach the questions in this case, having first an accurate notion of the *Page 43 
rights and powers of the appellant as receiver of the North American Trust and Banking Company. His counsel have been understood to argue, in effect, that all possible objections to the million and first half million trusts are centred in him, constituting in the sum total a simple power to repudiate them, if repudiation were possible at any time, under any circumstances, and for the benefit of any parties — a power to be exercised without regard to the elements of which it is composed, and without inquiry whether the parties who will receive the fruits of its exercise could, in their own peculiar right, assert the particular objection which may be held fatal to those trusts. It is claimed that the receiver represents both creditors and stockholders, and so all objections derived from either and both of these sources are put together and urged with united force, although it may happen that one of these classes will take the entire benefit of objections which only the other class can make. Views of this sort are perhaps slightly encouraged by a generality of expression, in adjudged cases, which did not, in their circumstances, call for precision and accuracy.
The receivership in question was constituted under sections thirty-nine, forty and forty-one of the Revised Statutes, concerning "Proceedings against corporations in equity." (2R.S., 463, 464.) Under those statutes, any creditor or stockholder of a banking corporation may commence a suit in equity for the causes therein enumerated, and the court may issue an injunction, and "appoint one or more receivers to take charge of the property and effects of the corporation," with authority to recover the debts due to it, and "the property that may belong" to it. The next section declares that "such receiver shall possess all the powers and authority" conferred by article third of the same title upon receivers appointed in case of the voluntary dissolution of a corporation. According to art. 3, secs. 67, 68, receivers appointed on voluntary dissolution "are vested with all the estate, *Page 44 
real and personal, of such corporation" — "as trustees for the benefit of creditors and stockholders," and they are declared to have all the power and authority conferred by law upon trustees of the estates of insolvent debtors, under the provisions of part 2, chap. 5, of the Revised Statutes. According to those provisions (2 R.S., 4], §§ 6, 7), trustees of insolvent debtors are "deemed vested with all the real and personal estate of the debtor," and they have "power to sue, in their own names or otherwise, and recover all the estate, debts and things in action belonging or due to such debtor, in the same manner and with thelike effect as such debtor might or could have done, if no attachment had been issued or trustees appointed."
The appellant, as receiver, has no interest in or power over the property affected by the trusts in question, except such as he derives under the statutes which have been mentioned. It has been said in this, as in other cases, that he represents the creditors and the stockholders, but for all the purposes of inquiry into his title, he really represents the corporation. He is by law vested with the estate of the corporate body, and takes his title under and through it. It is true, indeed, that he is declared to be a trustee for creditors and stockholders; but this only proves that they are the beneficiaries of the fund in his hands, without indicating the sources of his title or the extent of his powers. If, then, in a controversy between the receiver and third parties, in respect to the corporate estate, it is possible to form a conception of rights, legal or equitable, belonging to the shareholders as individuals, which the corporation itself could not assert in its own name, the receiver does not represent those rights. So far as shareholders are concerned, he can litigate respecting the fund upon precisely the grounds which would be available to the corporation, if it were still in existence, solvent, and no receivership had been constituted. In regard to creditors, I should certainly incline to take the same view of his rights and powers *Page 45 
under the statutes referred to. It has, however, been uniformly assumed, and was not denied on the argument, that he succeeds to the rights of creditors, and takes his title under them, where conveyances have been made in fraud of their rights, but otherwise valid. In such cases, he holds adversely to the debtor corporation. For all the purposes of the present controversy, I shall proceed upon this assumption.
In general, then, a receiver of this description takes merely the rights of the corporation, such as could be asserted in its own name, and on that basis only can he litigate for the benefit of either stockholders or creditors, except when acts have been done in fraud of the rights of the latter, but valid as to the corporation itself. In this particular case, it will readily be seen that the controversy is still further reduced, in respect of parties interested, to a mere question between the Palmers and others, holding the bonds secured by the two trusts, and the general creditors, claiming to annul those trusts and to share in the property embraced therein. On the part of the receiver, it has been strenuously argued that the corporation was insolvent when the trusts were created. If not, then its insolvency afterwards and at the present time has not been denied. If by repudiating the debts, or the greater portion thereof, something might be left for the shareholders, the decision which we pronounce in another branch of the case renders that result impossible. Following the principles laid down in the case of the State of Indiana (Tracy v. Talmage, 4 Kern., 162), and applying them to this controversy, we determine that the debts of the corporation cannot be repudiated upon any of the grounds which have been urged. It becomes absolutely certain, therefore, that the claims of creditors, including the bondholders, greatly exceed the entire value of the corporate effects. For this reason, if no other, the shareholders or individuals may be regarded as strangers to the controversy. The rights of creditors only are really in question. *Page 46 
The observations, so far made, lead not inappropriately to a general classification of the objections urged by the receiver against the validity of the million and first half million trusts. They are: 1. Those which assume that the trust conveyances are null and void to all intents, so that the corporation itself could at any time repudiate them; 2. Those which assume them to be void only as to creditors, on the grounds of fraud or illegal preference. Among these I include, conventionally, the objection that they were made for the "use of the grantor." In respect to the first class, the claim of the creditors, and consequently of the receiver, is under and through the corporation, and it rests on no other basis. In respect to the second, their claim is adverse, because it overreaches transactions valid against the corporation itself. I will now consider the several objections, proceeding according to the classification here suggested.
I. And first, then, it is claimed that both of the trusts are void, under section eight of the statute "to prevent the insolvency of moneyed corporations" (1 R.S., 588), because they were not authorized by any previous resolution of the board of directors. That statute declares that no conveyance, c., not authorized by such a resolution, "shall be made by any such corporation, of any of its real estate or of any of its effects exceeding the value of one thousand dollars." The next clause in the section makes certain exceptions not material to the question; and the concluding one declares that the conveyances,c., shall not be rendered "void in the hands of purchaser, for a valuable consideration and without notice." Conceding that no previous resolution of the directors was in fact adopted, sufficient in its terms to authorize either of the trusts, some of my brethren are of opinion that they can be sustained on the ground that the holders of the trust bonds are bona fide
purchasers, and so within the protection afforded by the last clause of this statute. While I do not dissent from *Page 47 
their views in this respect, I shall place my own conclusion mainly upon another ground, and three of my brethren concur with me in so doing.
In accordance with what seems to have been the opinion of one of the judges in this court, in Gillett v. Moody (3 Comst.,
486), opposed to his well considered decision in another tribunal (Gillett v. Campbell, 1 Denio, 520); in accordance, also, with a resolution concurred in by a majority of the judges, inTalmage v. Pell (3 Seld., 328), after that case had been disposed of on other grounds; and with a decision somewhat more directly involving the question, in a case quite recent (Gillett v. Phillips, 3 Kern., 114), where the point was neither argued by counsel nor considered by the court, I shall assume that banking associations, organized under the general act of 1838, are brought within the statute under consideration and within other provisions of the same title. I must observe, however, in passing, that this is an assumption opposed to the clearest convictions of my own mind; and that, if it were necessary in the determination of a controversy so important as the present, I should feel bound to inquire whether a doctrine which appears to me so plainly erroneous is irreversibly settled.
The objection we are now considering does not deny that the corporation had power to create the trusts. It only insists they were created in the corporate name and under the corporate seal by certain subordinate agents, who acted without due authority from their principal, and hence that they are void, If we may apply to the question the most familiar of all the doctrines of agency, such an objection cannot prevail, provided the principal at the time approved or afterwards ratified the act of its agent. The ratification need not be declared in express terms. Mere silence and acquiescence will in many cases be sufficient. So it may be inferred from the acts and proceedings of the principalin pais. When he receives and appropriates the *Page 48 
proceeds of a transaction done in his name and by his assumed authority, there exists the highest possible evidence of his approval. These rules are elementary, and are founded on the simplest ideas of justice in the dealings of men. They are also as plainly applicable to corporate as to other transactions, where the dealing is within the powers of the corporation. In such a case, no possible reason can be suggested why a corporate, as well as a private, principal is not bound by the dealings of its agent, which it has approved, and the benefit of which it has received and appropriated.
To these principles, so simple and so just, the receiver's counsel oppose the peculiar language of the statute. That requires, as they argue, a previous resolution of the directors and they insist that the assent of the corporation to the trust conveyances could not be given at any other time or manifested in any other manner; and the conclusion from this argument is, that the trusts must be annulled, however formally assented to at the time or afterwards, and even although the corporation actually received the proceeds thereof, amounting to over a million of dollars, and applied the moneys to its use in the payment of its debts and otherwise. If these views are justified by the statute, then, as to all the moneyed corporations of this state, principles of hitherto universal application, and founded in the plainest justice, are no longer in force. I cannot bring my mind to the conclusion that such was the intention of the legislature.
The precise object of the statute was to prevent fraudulent and improper transfers of the corporate effects by officers of the corporate acting without the sanction of the board of directors. It was simply in restraint of their authority and of their acts that the statute was enacted. It was not intended in any wise to abridge or restrain the power of the corporations themselves, as represented by their directors, over their effects, or to confine them to any special mode or particular time of manifesting their will in *Page 49 
the disposition of their property. The officer or particular agent who undertakes to dispose of the corporate estate, or any part of it exceeding one thousand dollars in value, must take his authority under a previous resolution of the directors. If he has no such authority, his act, standing alone and unsupported by any sanction, is void: just as the unauthorized act of any other agent is void as against his principal. But the corporations themselves, like other principals, may, nevertheless, act and be bound in any of the modes not opposed to the general rules of law applicable to such bodies. They may previously resolve; they may subsequently acquiesce; they may expressly ratify; they may intentionally receive and appropriate the proceeds of the unauthorized transaction, and so put it out of their power to dispute its validity. It is true the literal reading of the statute is, that no conveyance, c., "shall be made" without a previous resolution of the directors. But supply the words, "by particular officers or agents of the corporation," evidently implied in the whole scope and meaning of the section, and irresistibly suggested by the object the legislature had in view, and the whole difficulty disappears. Primarily, no doubt, the meaning of a statute is to be sought for in the language used, but that must be read with a due attention to the subject matter of the enactment, and to the general or particular end to be attained or mischief to be remedied. More than all, we ought not, unless compelled, to adopt a construction which would impute to the legislature an extreme and absurd intention, such as would be a design contrary to principles universally received in any other dealings, to take from corporations the power of giving effect in any possible mode of conduct to acts lawful in themselves and within their charters, but defective only because they were not within the authority of the particular agent who assumed to perform them.
Very different, I am persuaded, were the intentions of the legislature. At the time this statute was passed, it was *Page 50 
well known that moneyed corporation, besides their boards of directors, had presidents, cashiers and committees. It was also well known that these officers or particular agents might assume, and in fact that they did sometimes assume, to transfer the corporate effects, without any authority derived from the boards of directors. The power thus exercised was liable to great abuses, and experience had already exhibited such abuses. The legislature, therefore, struck directly at the power, and declared that it should not be exercised at all. The statute should therefore be interpreted, not as designed to abridge a single power which the corporations would possess if it had not been enacted, or to cripple them, and through them their creditors, in any of the modes of action by which they could bind themselves, but simply to protect them against the acts of their officers or agents, done without their authority. Quite consistently with this intention, they can bind themselves by approval and confirmation, expressly declared or implied from their conduct, although the previous authority was wanting. No one surely will contend that, upon general principles, a corporation cannot confirm any dealing or transaction which is within the reach of its powers, and which, therefore, it can originally authorize. A different doctrine would be a singular anomaly, which I do not think this statute has introduced.
Upon these views I prefer to rest my conclusion on this branch of the case. The North American Trust and Banking Company never questioned the validity of these trusts; on the contrary, we have the very highest evidence that it approved them. The deeds were executed in the name and under the seal of the corporation. Regarded as the acts simply of the officer who signed them, they were void (so I assume) under the statute; but, almost contemporaneously with the execution of the deeds, the company itself sold and pledged the bonds which the conveyances were made to secure, received the proceeds and used the *Page 51 
same in its dealings. These bonds were taken by parties who, it is not denied, acted in ignorance that the trusts were not authorized by a previous resolution, and who, as subjects of a foreign country, are not even chargeable with notice of the statute which it is supposed required such a resolution. I do not by any means say that a foreigner, any more than a citizen, can enforce in our courts a title to property here, acquired in contravention of our laws. The contrary is plainly true. But when the question is one of fair and honest dealing, our statutes are usually to be regarded as facts of which the foreigner is presumed to have no knowledge. I am not, however, seeking to introduce here the doctrine of equitable estoppel, but put my conclusion, as before stated, on the competency of the corporation to confirm the trusts in any effectual mode of corporate action, a competency which this statute was never intended to destroy; and I refer to the good faith of those dealing in the bonds, in reliance upon the trusts, for the purpose of showing what great injustice would result if we were to adopt the opposite view.
The trusts being valid as against the corporation, so far as the objection considered is concerned, the receiver cannot repudiate them for the benefit of creditors. In the absence of fraud, a creditor holds under and through his debtor, and is concluded by all the valid acts and assurances of the latter. (Candee v. Lord, 2 Comst., 275.) This principle is just as applicable to a corporate as any other debtor. Whether the trusts were fraudulent as to creditors is a distinct question, having no connection with the one which has been examined.
II. I come next to the objection that banking associations formed under the general law of 1838, have no power to borrow money, and hence that this corporation could not issue its bonds, create the trusts, or give any valid assurance for a loan. This is a very grave proposition, opposed to the known practice of probably every banking institution in *Page 52 
the state. It should, therefore, be well considered before it is received as the law. The question, it should be observed, in the form now presented, is one of simple capacity to borrow at all, and not whether the power was abused or even transcended by the North American Trust and Banking Company. If the power is found to exist, the question whether this company went beyond it in the particular scheme of which these trusts formed a part, and what are the consequences of such excess, might form a distinct branch of inquiry. It is proper also to observe, in this connection, that the authority to receive deposits, specially enumerated among the powers of these institutions, is not the one of which I am speaking. A general deposit in a bank, in its exact legal result, is a loan of money (Chapman v. White, 2 Seld.,
412); yet it may be true, as my learned associate, Judge Selden, thinks, that a power to receive deposits is not a power to borrow money in the more general and appropriate sense of those words. I proceed, now, to some examination of this objection to the trusts in question.
Banking is not in its nature a corporate franchise. In the absence of legislative restraints, it may be carried on by individuals and partnerships in all its departments of issuing, lending, receiving deposits, discounting, dealing in exchange, bullion, c.; and in examining the powers of banking corporations, the nature and incidents of banking as a business, when not under special legal restraints, are in the highest degree important. It is true the question will always be one of corporate power rather than of the rules and principles of banking; but those rules and principles may have a decisive influence in the construction of charters which profess to confer powers of this description. And this leads me to observe that banking, regarded as a business and not as a franchise, includes the borrowing of money as one of its features or incidents. As no one denies this proposition, I will not dwell upon it further than to *Page 53 
quote the remarks of an eminent English judge, Mr. PEMBERTON LEIGH, Chancellor of the Duchy of Cornwall, in a late case in the privy council (The Bank of Australasia v. Breillat, 6Moore's P.C., 152, 194). He observed: "The nature of a banker's business, especially if the bank be one both of issue and deposit, necessarily exposes him to sudden and immediate demands, which may be to the extent of a large portion of his debts, while his profits are to be made in employing his own moneys and those intrusted to him in discounting bills, in loans and other modes of investment. It is impossible that he should always have his assets in such a state as to be applicable immediately to the payment of all demands that may be made upon him; and if a partner has no power, under such circumstances, to borrow money for the partnership, either the assent of each individual must be obtained, which is impractible, or the concern must be ruined. We have no doubt at all, therefore, that in ordinary banking partnerships such power exists, and that the directors, by the terms of their appointment, have all the general powers, and, among the rest, the power of borrowing, unless such power is excluded by other provisions of the deed." It may be quite material, when we come to examine the general banking act of 1838, to observe now, in passing, that in these observations, so just and forcible, the borrowing of money is spoken of, not as adistinct department or branch in the business of banking, but is asserted as the incident and result of two of its most important operations: those of issuing and receiving deposits. The opposite idea, I think, will presently appear to be a source of error in conclusions on this subject.
If, then, a number of persons should associate themselves together as bankers, in the recognized modes of carrying on that business, it will be, and, as I understand, it is admitted that the managing partner or partners, or any general and unrestricted agent, could bind the firm by engagements contracted for moneys loaned, without a specification of the *Page 54 
power in the partnership deed. I consider it, moreover, to be plain, that an association which has filed the proper certificate, under the law of 1838, and so become incorporated, has precisely the powers, direct and incidental, which a mere partnership would have if all the provisions of that act, supposed to confer powers or to restrict them, were inserted in the articles of agreement, and providing there were no other restraining laws. I have, indeed, no hesitation in calling these associations partnerships, although they have also so many of the peculiarities of corporations that the courts of this state have quite uniformly held them to be such, upon most questions which have arisen concerning them. I broadly admit them to be corporations, but they are also associations or partnerships. I admit, also, that they take their powers under the organic act, but so do partnerships under their articles. What I assert is, that the measure of power would be the same in both cases, if conferred in the same terms. Corporations, I admit also, can only exercise the powers expressly or incidentally conferred. It scarcely needed a statute of this state to declare a principle of the common law so familiar; and there is nothing in the terms of the statute (1 R.S., 600, § 3), quoted with so much emphasis, to give greater intensity to the doctrine.
Let us then suppose all statutes prior to 1838, in restraint of banking, to be done away, and a mere partnership formed under articles, reciting an intention to pursue "the business of banking," and declaring that the associates would, under a certain name, carry on that business in or by the issuing of circulating notes, receiving deposits, discounting bills, dealing in exchange, bullion and coin, and loaning money on real or personal security. I know of no broader terms in the English language to define "the business of banking;" and would any one, who admits that the borrowing of money is included in that business, deny that the power would be embraced as the incident of some or all of the operations *Page 55 
enumerated? And yet, in this supposed language of a partnership agreement, we have the organic law of 1838. In the title of the act the intention is declared "to authorize the business of banking." In the first fourteen sections the issuing power is granted without limit, but under very peculiar and exact regulations, framed to protect the currency and afford to the billholder, in the securities provided, an absolute certainty of ultimate redemption. In the 18th section, all the remaining banking powers of which I have ever heard are conferred. It declares that "such association shall have power to carry on the business of banking, by discounting bills, c., by receiving deposits, by buying and selling bullion, coin and exchange, by loaning money on real and personal estate, "and by exercising such incidental powers as shall be necessary to carry on suchbusiness." Now, if a mere partnership, such as I have supposed, could borrow money, and the act would not be ultra vires if done by those in the direction of the business, how, it may well be asked, would the same association lose that power by merely making and filing a certificate according to the 16th section of the banking law, but without any other change in its organization? It is not the banking powers, let it be remembered, which turn the association into a corporation. The capacity of perpetual succession, the power of suing and being sued, of contracting in the particular name selected, of having a common seal, of making by-laws, c., are the incidents which, in the judgment of the courts of this state, have invested these associations with a corporate character. (Thomas v. Daken, 22Wend., 9; Warner v. Beers, 23 id., 103.) The banking powers conferred are not, either in their nature or extent, changed or affected by this conclusion of the courts, the soundness of which I do not question.
If, so far, I have differed from those who deny the power in question, I think the difference is in the mode of statement rather than in principle. The objection to the power is, after all, really made to turn on the terms of the banking *Page 56 
law itself; and many of the preceding observations have been made in order to approach the construction of those terms through the usages and necessities of banking as well as that through the technical law of corporations in general.
We come then to the question of construction, which to my own mind presents no difficulty. The argument on the other side urges that "the business of banking" is authorized by the 18th section, only according to the specifications therein contained, among which the power to borrow is not found. To this the answer is, that these specifications, with the issuing power granted in the previous sections, cover the whole ground of banking. If the statute had omitted the general terms "business of banking," and had merely enumerated the power of issuing, and all the others named in the 18th section, that would have been a general grant of banking powers, including, as their incident, the right to borrow money when a necessity may arise in the exercise of those powers.
To deny this conclusion is necessarily to assume (and it seems to be assumed, perhaps unconsciously) that borrowing is an independent operation in the business of banking; in other words, that it is banking in one of its branches, and hence that the power cannot exist without a particular specification. This is, I think, plainly an error; and yet it appears to lie at the foundation of the opposing view of the present question. Now, in a very simple and elementary view of the subject, borrowing is not banking, nor is it in a just and proper sense any other kind of business. It is the incident and auxiliary of various kinds. Let us test this. If a person should open and keep an office for receiving deposits payable on demand, he would carry on a well known branch of banking business, although he might use the deposits in speculation or other modes totally unconnected with banking. He would be a banker. So if he were to keep an office for issuing his own circulating notes, or for dealing in exchange, or for discounting bills, and should *Page 57 
actually carry on either of those operations without the others, he would exercise a banking power, although confined to a single one. But suppose he keeps an office and habitually borrows money on time, which he uses in manufacturing or some other branch of industry: was it ever supposed that such a practice made a man a banker? In truth he performs neither a banking nor a manufacturing operation, but one which is simply auxiliary to the business in which he is engaged. A banking corporation, therefore, when it borrows money, exercises an incidental and auxiliary power, not expressed, but implied from those which are expressed. On this ground the English Privy Council proceeded in the case of the Bank of Australasia v. Breillat (supra), as will be seen in the extract quoted above from the opinion in that case. The right to borrow was not among the specifications in the deed, but was referred to the powers of issuing and of receiving deposits, which were specified. If these views are correct, they would seem to be decisive, for in the act of 1838 all known express banking powers are enumerated.
The course of bank legislation in this state leads to the same conclusion. In the charters prior to 1825 there was no enumeration of the banking powers, but in that year the Commercial Bank of Albany was chartered, "with all incidental and necessary powers to carry on the business of banking, by discounting bills, c.," proceeding with the same specifications as in the act of 1838, now under consideration. This was the model of a vast number of charters down to and including the year 1836, when special legislation of this kind ceased. Now, it is a fact not at all remarkable, but very pertinent to the present question, that in no special bank charter ever granted in this state was it thought of to specify the borrowing of money as one of the substantive and express banking powers. Yet I am not aware that it was ever before suggested that the right to borrow was excluded by the enumeration of those powers. *Page 58 
Those specifications were evidently intended not to restrict the appropriate business of banking, but as a mere legislative definition of that business; a definition not indispensable, perhaps, but eminently useful, because it left nothing to construction or in doubt. Even the restraining laws may be referred to in corroboration of these views. Corporations, not expressly incorporated for banking purposes, were prohibited from exercising banking powers under a specification precisely like that found in all the special bank charters and in the general charter of 1838. (1 R.S., 712, §§ 3, 6.) Indeed, it would be difficult to conceive a greater absurdity than a prohibition against borrowing money in a statute intended merely to restrain unauthorized banking.
Again, suppose a corporation were chartered under a special or general law for manufacturing purposes, with a particular authority to borrow money whenever deemed necessary in the business: would that be considered a grant of one of the banking powers? Plainly not; and quite as plainly it would be, if the authority were to receive deposits or discount bills, or issue circulating notes.
Under these views, it is not very important to answer the question, Why did the legislature of 1838 specify the express powers which it was intended to confer, instead of leaving them to be derived from the general grant to carry on "the business of banking?" That legislature surely might copy the language of its predecessors since the year 1825, without affording any occasion for imputing to it the special intention of excluding a well known incident of that business. Still the question is not difficult to answer. In the restraining law of 1830 (1 R.S.,
712, § 6), it was declared to be unlawful, without express legislative authority, to keep offices of deposit, discount, c. The act of 1837 (Stat., p. 14) removed this restraint only in favor of persons and associations not incorporated. In order, therefore, to confer upon associations, under the act of 1838, the *Page 59 
powers of discount and deposit, it was necessary to specify them. This, it is true, is a reason which does not apply to the other powers enumerated. But a specification of these two only would have furnished pretty strong ground for the very inconvenient inference that the others were intended to be excluded. If the statute had read: "Such association shall have power to carry on the business of banking, by discounting bills and receiving deposits," the rule "expressio unius exclusio alterius" would have been of very dangerous import to the right of dealing in exchange, bullion and coin. In short, the existing state of the restraining laws rendered it necessary to specify some of the express powers intended to be granted, and those alone could not be specified and the others safely omitted.
We arrive then at the conclusion that the North American Trust and Banking Company had capacity to borrow money as incidental to the banking business and the powers expressly granted. But the objection takes another form. It has been urged that these associations cannot borrow money as a substitute for capital. If by this proposition it is only meant that these institutions, having no capital subscribed at all, cannot lawfully procure it upon loan and so make a total substitution of credit for capital, the doctrine has no precise application to the present case; for this company had an actual capital of some $3,000,000 subscribed and paid, and it is not denied that the subscriptions were paid in a manner which the law permitted. It is remarkable, however, that there is no provision in the law requiring a single dollar to be paid by the shareholders. The association must, in some way, whether upon credit or with capital, procure mortgages and stocks, and deposit them with the comptroller of the state, in order to secure the ultimate payment of its circulating notes, if it issues any. But it is not compelled to exercise the issuing power at all; and if it chooses not to do so, then it has no occasion to procure or deposit the securities, and it will have no circulation to *Page 60 
redeem in cash. It may confine itself exclusively to the banking operations of deposits, of discount, c., specified in the 18th section; and there is certainly nothing in the act which prohibits carrying them on with borrowed capital. An individual banker can certainly do this. So can a partnership which has no corporate privileges. And why then cannot a partnership which has power to incorporate itself and does so under a general law? Corporations, it is said, can act only in accordance with the law which creates them. But if the law authorizes them to do acts specifically, and is silent as to the manner and means of doing those acts, where is the restriction, except such as the nature of the business implies? Banking, I repeat, is a business and not a franchise. The public have a special concern in the circulation only, and that is guarded in the act of 1838 by a series of very peculiar and exact provisions. Beyond that, I have no doubt the legislature intended to leave the business essentially free. It allowed all persons to associate, to become incorporated by their own act, and it conferred the most ample banking powers, without a single restriction in the use of those powers. And this view derives additional strength when we consider that by a legislative act in the previous year all restraints upon banking, except those intended to protect the currency, had been abolished in favor of all persons and mere associations, and the business thrown open to them without restriction. (Stat. of 1837, p. 14.) Now it may be true that, in point of public policy, associations in the banking business which have filed a certain certificate, and so incorporated themselves, ought to be under some legislative restraint in the power to borrow money in that business; but whatever argument can be adduced to prove this, the same argument will establish incontrovertibly that banking should be altogether prohibited to individuals and mere partnerships, for in them the power to borrow is confessedly unrestrained. Such I say may or may not be sound public policy, but these were not the views which *Page 61 
prevailed in 1837 and 1838, or since that time, nor was it the policy of the legislature of those years. For proof of this we need only to look at their acts. The statutes of 1837 removed the restraints upon banking (of course I do not speak of issuing bills for circulation), and thus by necessity connected it with the most unlimited power of borrowing by individuals and associated bankers. Such became from that time the policy of the state, whether wise or unwise is not the question. The act of 1838, so far from interfering with this policy, carried it still further into the issuing department, requiring only that the associated bankers should incorporate themselves in the manner provided, as the condition of exercising that power also, and that both individuals and associations should deposit a perfect security and receive from the comptroller their circulating notes. In those conditions, I confidently affirm, are to be found the only remaining restraints upon the business of banking left by the act of 1838. Whoever, therefore, invokes public policy for the purpose of finding a restriction of the right to borrow in the course of that business, in order to render himself intelligible, should refer to his own private views, and not to the actual policy of this state.
If we admit, then, that these associations can borrow, and I trust this has been shown, I do not see in what quarter we are to find restraints upon the power, so long as it is exercised in the course of that business. The right exists as the incident of banking, and beyond that it cannot be exercised without transcending the limit of corporate power. The act of borrowing for objects not within the general scope of that business would be ultra vires. But if the power exists, we cannot say that the lending contract is void, because the occasion for the loan arises out of a course of merely imprudent and hazardous dealing. This particular company, no doubt, carried its credit to extraordinary lengths, and it may even be true that its embarrassments arose out of speculations in stocks or other *Page 62 
transactions not within its powers. But its debts, in the forms they had assumed when the million and half million trusts were created, so far as they have come under our consideration, and particularly its great debt to the Palmers, were legal and valid. So we adjudge in that branch of the controversy. The necessity of paying these debts was therefore a banking necessity. Without going back to original transactions in this country, which may have been ultra vires or illegal, the creditors of this company, and chiefly the Palmers, had advanced immense sums upon its bills of exchange, and in redeeming its certificates of deposit and debentures; and these advances, as we determine, constitute legal and just debts. Those the company were bound to pay. Even if we admit that a large amount of outstanding obligations, not yet due, were illegal or prohibited in their form, still the holders who had advanced money thereon were entitled to recover it. This was determined in the Indiana case. Now, if a bank may not borrow money when it cannot otherwise meet its pressing engagements, and must go into insolvency if it does not meet them, I know not what exigency will justify a resort to the borrowing power.
The conclusions at which we arrive, affirming the right of banking institutions to borrow money, and sustaining its exercise in the case before us, do not necessarily result in the doctrine laid down by a very able judge, assistant Vice-Chancellor Sandford, in the case of Barry v. The Merchants' ExchangeCompany (1 Sand. Ch. R., 280, 289). That case, however, should not be overlooked in this discussion, because it asserts a principle which more than covers the ground now in controversy, and because the same question afterwards arose in this court. The Merchants' Exchange Company was chartered with a capital of $1,000,000, for the purpose of building an exchange in the city of New-York. After the first erection was destroyed by fire, the corporation purchased more land and rebuilt on a larger *Page 63 
scale, at a total cost of over $2,000,000, but without any increase of the capital. There was no authority to borrow money expressed in the charter, but the entire expense, over and above the amount of the capital, was defrayed by means of loans procured upon the corporation bonds, secured by one or more mortgages executed in trust to Mr. King. The great question in the case was upon the power of the company to contract the loans and to secure them by the bonds and the trust mortgages, and the power was affirmed. The precise doctrine of the case is stated in the following language of the assistant vice-chancellor: "A corporation, in order to attain its legitimate objects, may deal precisely as an individual may who seeks to accomplish the same ends. If chartered for the purpose of building a bridge, it may contract a debt for labor, the materials, or the land upon which the bridge is abutted. If more advantageous, it may borrow money to purchase such land or materials, or to pay for such labor; and, as the evidence of the indebtedness, it may execute to the creditors a note, a bond or a mortgage, whether the debt be for the money borrowed, or the work, materials or land." The question was also before this court, in the case of King v. The sameCorporation, upon the very same exercise of power (1 Seld.,
547); and the objection, that the company had no authority to borrow money, was distinctly presented on the argument. The point seems also to have been necessarily involved in the case. The decree of the supreme court of the city of New-York was affirmed, thus establishing the validity of the trust mortgages made to secure the loans. In the opinion of the court, the objection made to them under the statute of uses and trusts is the only one discussed; but the one which alleged the want of power to borrow money was equally involved. It must have been disposed of by including it among what are called, in the opinion, "various minor objections, which did not require a particular notice." I do not regard such a decision as conclusive upon us *Page 64 
when it can be shown to be wrong. It would not, however, be respectful to those who were then members of this court to suppose that this question escaped their notice, for it was distinctly involved in the case, and was called to their attention on the argument. The decision is, therefore, at least high evidence of what they understood and assumed the law to be.
But can these decisions be shown to be wrong upon principle or authority? I confess my own inability to refute the doctrine so perspicuously laid down by Assistant Vice-Chancellor Sandford. I am not aware that it comes in conflict with any known distinction between private persons and corporations. It is true that the latter take all their powers, direct and incidental, under their charters; but when the direct power is granted in terms, they take it, as a natural person enjoys it, with all its incidents and accessories. A simple association of merchants to build an exchange, could, if they so agreed with each other, very appropriately borrow money in furtherance of the object; and why can they not, if they take the principal power under a charter from the government, which enables them to act as a single person and with a collective will?
It is truly said that corporations can only exercise such incidental powers as are necessary to carry into effect the express objects of their charters. But necessity is a word of flexible meaning. There may be an absolute necessity, a great necessity, and a small necessity; and between these degrees there may be many others depending on the ever varying exigencies of human affairs. It is plain that corporations, in executing their express powers, are not confined to means of such indispensable necessity that without them there could be no execution at all. The contrary doctrine would lead at once to a very great absurdity; for if there are several modes of accomplishing the end, neither one is indispensable, and each would exclude all the others. And thus, by inevitable logic, an express grant of power *Page 65 
would lie forever dormant, because there are more modes than one of carrying it into execution.
It is almost as difficult to say that the incidental power depends for its existence on the degree of necessity which connects it with the power in chief. Such a doctrine would impose upon courts a never ending difficulty, for the inquiry would always be whether the chosen instrumentality is the very best that could be selected; and if not the very best, however minute the difference may be, then the inevitable decision must follow that the choice was fatally bad, although strictly adapted to the end in view and made in the utmost good faith.
These demonstrations, for such they appear to me, would seem to leave but one other conclusion, which is, that corporations, along with their specific powers, take all the reasonable means of execution, all that are convenient and adapted to the end in view, although not the very best by many degrees of comparison. And this is a doctrine which must necessarily result in the liberty of choice amongst those means. The choice may be wise or unwise. If made in the exercise of an intelligent good faith, the wisdom of the selection may be called in question, but the power to make it cannot be.
I can therefore see no room for the distinction which admits the power of a corporation to contract debt for labor and materials to be used in building an exchange, or a bridge, or a turnpike road, or in manufacturing, those being in each case the specified object of the charter, but denies the right to borrow money to be used in the purchase of the same labor and materials. If there be any reason for a distinction, resting on a comparison of benefit to the corporation, the advantages of borrowing would in most cases be undeniable. So, in point of public policy, the reason for that preference would appear to be still stronger, for while the industrial classes would require no protection, the money lenders could safely be left to guard their own interests. I *Page 66 
believe the distinction referred to is not recognized by any adjudged case.
If these views in regard to trading corporations in general are sound, then our conclusion, which affirms the power of incorporated banks to borrow money, when not specially restrained, rests not only upon the peculiar nature and necessities of banking business, but upon a principle somewhat more comprehensive.
III. The trusts are also objected to on the ground that the power to borrow money could not be exercised in the particular mode of issuing the so-called million and half million trust bonds as assurances for the moneys advanced, and this point is next to be examined. This objection raises the following questions: 1. Is it within the power of corporations generally to issue instruments of this kind, when no prohibitory or restraining statute is violated, and the purpose or occasion of making them is lawful? 2. Is there any express or implied prohibition, contained in the act of 1838 or in any antecedent statute, by which this company was bound? There are no other aspects in which this objection can be presented, provided the bonds were issued prior to June 3, 1840, when another statute took effect. The time of their issue will be hereafter noticed.
The first of these inquiries can be briefly answered. The right of corporations in general to give a note, bond or other engagement to pay a debt is so nearly identical or so inseparably connected with the right to contract the debt, that no doubt upon the question ought to be admitted. When a corporation can lawfully purchase property or procure money on loan in the course of its business, the seller or the lender may exact, and the purchaser or borrower must have the power to give, any known assurance which does not fall within the prohibition, express or implied, of some statute. The particular restriction must be sought for in the charter of the corporation, or in some other statute binding upon it; but if not found in that *Page 67 
examination, we may safely affirm that it has no existence. This doctrine would seem to be clear in principle, and it is well settled in this state. (Mott v. Hicks, 1 Cow., 513;Barber v. Mechanics' Ins. Co., 3 Wend., 96; Jackson v.Brown, 5 id., 596; Moss v. Oakley, 2 Hill, 265;Attorney-General v. The Life and Fire Ins. Co., 9 Paige,
470; Safford v. Wykoff, 4 Hill, 442; Barry v. Merchants'Exchange Co., 1 Sandf. Ch. R., 280.) It would be a very illogical conclusion to hold that an indefinite number of corporations, authorized by a general law, do not possess the same right in this respect which they would have if the express powers of each were derived from a special charter.
In the second place, if there are any special legislative restraints, which in their terms or policy condemn the trust bonds, they are to be found in the safety fund act of 1829, or in the statutes against unauthorized banking, called the restraining laws, or in the organic act of 1838, from which this corporation derived its powers. There is no other particular legislation supposed to have any bearing on the question.
The argument of the receiver's counsel, so far as it is derived from the safety fund act (Laws of 1829, ch. 94, p. 167; 1R.S., 737, 3d ed.), turns wholly upon the thirty-fifth section of that statute, and may also be answered in few words. This was an act, applicable only to future banks and those whose charters should be renewed in future, requiring them to contribute annually, for six years, one-half of one per cent upon their capital to a fund specially pledged for the redemption of the circulating notes of insolvent institutions. The thirty-fifth section contains a prohibition against the "issuing of notes and bills," unless payable on demand and without interest. The evil intended to be suppressed by this prohibition was undoubtedly the practice of issuing post notes, designed and calculated to circulate as money. The provision is, however, broad enough in its terms to include all bills and notes payable at *Page 68 
a future day, and so it has generally been construed. It is, however, in its very language, confined to banks "subject to the provisions" of that act; in other words, liable to contribute to the safety fund thereby created. These trust bonds were issued by an association which, as we know, was not subject to the provisions of that act, and was therefore exempt from the operation of this particular section. This is a decisive answer to the objection in this form, and no discussion can make the argument plainer. I will add, however, in this connection, that in enacting the general banking law of 1838, the legislature had this statute before them and refused to adopt it into their work. They refused not only to adopt this restriction, but any other indicating the same policy. The reason for this refusal, I think, we shall see when we come to look once more at the structure and policy of the system which they did adopt, and compare them with previous systems.
In further discussing the objection to these bonds we are to consider the restraining laws and the general act of 1838, and these matters are so connected that they must in some degree be examined together.
The statute of 1829 against unauthorized banking (1 R.S.,
712), known as the restraining act, declares (§ 6) that "no person, association or body corporate, except such bodies corporate as are expressly authorized by law, shall keep any office for the purpose of receiving deposits or discounting notes or bills, or issuing any evidences of debt, to be loaned or putin circulation as money, nor shall they issue any bills or promissory notes or other evidence of debt as private bankers, for the purpose of loaning them or putting them in circulation as money, unless thereto specially authorized by law." Some of the other sections in the same act are intended to promote the same policy, but they need not be referred to. It cannot fail to be noticed that this statute does not forbid either natural or artificial persons from entering into written engagements of any description, provided they *Page 69 
are not issued to be loaned or put in circulation as money. Indeed, the inference is almost irresistible that corporations, whether banking or not, as well as individuals, might, at least in the opinion of the legislature, create evidences of debt which do not fall within the particular class condemned. Such a statute is not, however, the source from which to derive that power. It is simply a prohibitory statute, which appears to assume that the power exists. The particular object of the act, it is well known, was to restrain all unincorporated persons and all corporations which had not a special authority of law from exercising banking powers.
The most delicate and dangerous by far of all these powers was that of creating a paper currency, to be loaned and put in circulation as money, for the use of the community. While, therefore, all other restraints were removed, by the act of 1837, already cited for another purpose, so far as unincorporated persons are concerned, this particular one was kept in full force precisely as it stood in the act of 1829, binding both upon persons and corporations of every description. It may be useful to add, that the restraining act of 1829 contained nothing new which is material to the present purpose. The policy began in the year 1804, was continued in the acts of 1813, 1818, 1829, down to the year 1837, and even in the statute of that year it was maintained, as we have just seen, so far as the power of creating currency is concerned. It was thus that banking in general became with us a franchise at an early day; but it has never been held, and I think never suggested, that there was anything in the restraining statutes, or in the policy they indicated, to deprive corporations of any kind of the incidental power to contract debts and make their written engagements therefor in any form not coming within the particular condemnation of these statutes. Banking only was restrained, one of the distinct operations of that business being the issuing upon loan of a paper currency; but the incidental *Page 70 
power of corporations, whether belonging to that class or not, to become a debtor as well as a creditor, and to create their obligations not intended or calculated to mingle in the currency, never came within the prohibition.
We come then to the general act of 1838, which I am sure can now be intelligibly examined with reference to this question. The restraints upon issuing notes, bills, c., upon loan or for circulation as money, as we have seen, were still in force; and it is now very pertinent to observe, that this act did not repeal them. They are in full force at this day. The statute, however, did authorize the creation of an indefinite number of associated banks, which we call banking corporations, and gave them the issuing power upon the precise conditions therein contained; and it gave the same power to private individuals also, under the same exact conditions. Those conditions required that the notes intended to be loaned and issued as currency should be payable on demand, should be countersigned and registered in one of the departments of the state government, and should be secured by a pledge of bonds and mortgages and stocks. This, I repeat, was not a repeal of the restraining acts, but it was the "special authority of law" required by the very language of those acts, in order to exercise the business of banking in the particular department of creating and issuing a paper currency. It is, therefore, beyond all question, true that this power cannot be exercised under the act of 1838, except upon the precise conditions named; and if the trust bonds of the North American Trust and Banking Company were an exercise of that independent banking power, the conclusion would certainly follow that they were unauthorized. They would be ultra vires, because no "express authority" to issue them can be found in that statute, and expressly prohibited by the restraining act.
But it is just as plain that this "special authority of law," which conditionally relieved, and which was necessary *Page 71 
to relieve, associated banks and private persons from the operation of the restraining laws, was not in any sense a prohibitory statute. On the contrary, it was plainly an enabling statute. It prohibited, neither expressly nor impliedly, anything previously lawful; but it simply enabled that to be done, under particular conditions, which was before unlawful. The legislature of 1829, and its predecessors since 1804, had declared that no banking powers should be exercised without special authority of law, and that authority was contained in a great number of special bank charters. The legislature of 1837 declared that individuals and associations might exercise those powers without restraint, except the one of creating currency. The legislature of 1838 said to them: "You shall have that power also, provided you associate in a certain manner if you act as associations; and provided, further, whether you act as individuals or associations, that you procure your circulation and secure its redemption in the manner we have pointed out."
These views of the act of 1838, and of antecedent legislation, if they are correct, meet with directness and force the argument so much urged by the receiver's counsel, that out of the express provisions contained in that act, allowing circulating notes of a particular kind to be issued, payable on demand, there arises an implied prohibition against all other written engagements, and especially against all time paper. We are enabled to see distinctly that, without the express authority of law contained in those provisions, neither associations nor individuals could lawfully issue notes for circulation or upon loan, payable on demand. That banking power was sealed up as a franchise by the previous legislation and policy of the state. It was opened only on the performance of the conditions precedent which have been named. To all persons and associations not performing those conditions it remains sealed as before. But it would be absurd to hold that, in thus opening the franchise *Page 72 
and laying down those conditions, the legislature intended anything more; and especially it would be absurd to say that out of such a statute there springs a condemnation of that which was antecedently lawful. How it is that an act of legislation, extending a particular franchise to new classes of individuals and associations, and so removing from them one restriction, engenders another and a new one, has certainly not been explained.
The objection to the bonds as time paper, when urged under the act of 1838, not only overlooks the restraining laws, as indispensable to a correct view of that act, but also the distinction between the express and the implied powers of banking and other corporations. The argument assumes that when one of these associations gives a written obligation for money borrowed or stocks purchased, payable at a future day, it exercises a distinct and express banking power not granted in the statute. This is not true: the right thus exercised is incidental and accessory to those banking powers which are expressly given. This distinction has already been considered at large in discussing the power to contract a debt, inseparably connected with which must be the ability to promise, in any form not expressly forbidden, to pay such debt. Indeed, the necessity of creating time paper, for money borrowed to redeem circulating notes payable on demand, often arises out of the particular franchise of issuing such notes, and that necessity results in the right to enter into such engagements. In this view, the grant of the franchise in express terms, instead of excluding the power now in question, may become the very source from which it springs.
There is, then, in the language of the general banking law, no implied force to invalidate the trust bonds. It is next to be observed that the act contains no express prohibition. Its provisions will be examined in vain for a single clause to which such an interpretation can be given. On the contrary, we shall find language which plainly recognizes *Page 73 
a distinction between the special issues for circulation, countersigned and secured in the manner provided, and other contracts and engagements of the associated banks. But I do not rest the right to issue these bonds upon that foundation. Its source must be found, both theoretically and practically, in the incidental power of corporations, and especially in the nature of banking, and the accidents and necessities which attend that business.
We are brought, then, to an inquiry which belongs essentially to the facts of the case: What was the character of these instruments? Were they in the nature of currency? Were they issued to be loaned, or for circulation as money? If they were, then their issue and sale amounted to the usurpation of a banking franchise not granted in the general charter and prohibited by the restraining laws. Here, I apprehend, is the turning point on which the validity or invalidity of the bonds must depend, and on this subject, it seems to me, there is no room for reasonable doubt. They were not issued "to be loaned." The banking association was not creditor in these transactions, nor did the dealer become a debtor. The relation was exactly reversed. The association was the borrower and the debtor in respect to each bond, and the dealer became the lender and creditor. They were not issued for "circulation as money." Without examining the question whether, in strict law, they were perfect as sealed instruments, they had impressed upon them the corporate seal, were intended to be and in all their appearances were sealed. They were eminently special, also, in the language which expressed the obligation. Still, in their legal effect, they might be promissory notes if the seal be entirely rejected; but it is certain they could not be accepted and received as such in any community. They were moreover payable in large sums, at distant periods of time and in the coin of a foreign country to which they were transmitted, and where they were sold or pledged. They were, in short, wholly unadapted to circulation as *Page 74 
money; they were not designed to be circulated, and in fact they never were. We must therefore hold that these obligations were not issued in a course of unauthorized banking, and hence that they do not fall under the condemnation of the restraining statutes.
We find, then, in all the legislation of this state, antecedent to the issuing of these bonds, nothing, either in the direct or implied force of language, which pronounces against their validity. On the other hand it cannot be pretended that there was any express authority. The question therefore turns upon the incidental power of corporations, and particularly of banking corporations, when not specially restrained, to contract a debt for money borrowed upon a lawful occasion, and to execute an appropriate assurance for the payment of such debt at a future day. That question has already been examined, and the power asserted upon grounds which are to me satisfactory. Something however remains to be observed, which I think will place the subject in a still clearer light.
In the argument upon this branch of the case, much was said concerning the general intention of the legislature and the supposed policy of the state. These matters I will now briefly examine, endeavoring to show why, in the free banking system of 1838, the legislature omitted to impose restraints upon the business of banking, except in the particular department of issuing bills to circulate as money. That system has been undoubtedly in some degree misunderstood.
In the year 1791 an act was passed "to incorporate the stockholders of the Bank of New-York," which became the model of some forty other institutions specially chartered prior to the year 1825. These banks were authorized to carry on the "business" of banking, in general terms, without specification of the power to issue bills or any other banking power. They were unrestricted in the exercise of any of their powers except that of contracting debt, which, over *Page 75 
and above the specie in their vaults, was not to exceed three times the capital subscribed and actually paid in. The debt might be contracted in the issue of currency for circulation, or otherwise, the amount only being limited. There was a prohibition, also, against trading in merchandize and stocks, which was designed of course to confine these institutions to the business for which they were chartered. The solvency of banks was only guarded by these two provisions; but what is chiefly to be observed is, that the currency was not in any other manner protected. Such was banking prior to 1825. It was a most imperfect system, not for the particular reason that a bank might become insolvent in the exercise of the debt-creating power, whether by issues payable on demand or by time engagements, but because in the event of insolvency the currency circulating through the community would not be redeemed. No distinction was made between the billholder and other creditors. The duty of government to protect the public against a debased currency, and the wisdom of not interfering with banking in its other operations, were not yet understood. (For an example of thesecharters, see the act to incorporate the Mechanics and Farmers'Bank of Albany, Laws of 1811, ch. 64.) Under this system I suppose it will not be doubted that banks could borrow money to pay their debts and execute time obligations to the lender. The precise evil of the system was the excessive issue of a paper currency with no security for its redemption. (Message of Gov.Clinton, in 1827.)
In the year 1825 two bank charters were granted, and no others until 1829. In these, the business of banking was defined, as we have already seen, but the definition included all known powers belonging to that business, and therefore, in this respect, those charters instituted no new policy or restraint. In other respects, some new provisions were introduced, one of which required that fifty per cent of the capital stock should be actually paid in. But the system remained unchanged. The debt-creating power remained *Page 76 
as before, it being declared that the total amount of debt, whether "by bond, bill, or other contract," should not exceed, c. This language was certainly anything but a restriction confining the banks to issues of currency payable on demand. Another clause declared the assignability of sealed obligations, thus distinctly implying that such might be created. (Charter of the Commercial Bank of Albany, Laws of 1825, p. 198.)
In the year 1827 a general act was passed, which took effect in January, 1828, and became incorporated in the Revised Statutes (1R.S., 601), applicable only to existing banks. In this statute are some new regulations concerning the management of banking corporations, directed to special abuses, but no change in the system. It was thought no important change could be made in respect to preëxisting charters. The power of creating debt remained as before, and was limited, as before, to three times the amount of capital paid in, whether created by "bond, bill, note or other contract" (§ 3); and thus the legislature, so far from restricting the right, again justifies the inference that time engagements might be issued. The issues for currency were still blended with other modes of creating debt and still the community was unprotected.
The evils and abuses of such a system gave rise also to another code of regulations, elaborately prepared, which took effect at the same time (1828), applicable to future charters and charters which should be renewed in future. This was the act to prevent the insolvency of moneyed corporations. (1 R.S., 589.) This code, as well as the one applicable to existing banks, recognized in very unambiguous language a distinction between bills and notes for circulation, payable on demand without interest, and demands of a different character and bearing interest. (§ 20,subs. 5, 8; id. 2, sub. 2.) It omitted the provision limiting the amount of debt, but required the whole capital to be paid. Reports were required to be made to the comptroller, *Page 77 
and a series of new and stringent regulations were laid down. The principles of bank legislation, however, remained unchanged. The great vice of the system was untouched. There was no limit to the power of creating debt. Excessive issues of currency might be made, and there was as yet no specific provision for the billholder.
The safety fund act of 1829 took a feeble step in the right direction by establishing a specific fund for the redemption of the circulating notes of insolvent institutions. This, it is true, was a fund of very minute proportions, but, so far as it went, it provided a special security for the billholder, and tended, no doubt, in some degree, to impart stability and soundness to the currency. This act limited the issues for circulation to twice the amount of capital paid in, and, for the first time in the legislation of this state, it prohibited the issue of bills and notes unless payable on demand. The act was only applicable to future charters, or previous ones to be renewed. Between the years 1829 and 1836, inclusive, many bank charters were granted, subject to the code of regulations and the safety fund law. But fundamental principles underwent no change, and the system was soon after exploded by its own inherent vices.
Thus far, since 1804, banking in this state had been a monopoly by force of the restraining laws. In the year 1837 these monopolies had become intensely odious, and no more special charters were then or ever afterwards granted. The legislature, moreover, as we have before seen, by a change in those laws in the year 1837, reduced banking to a private business, except in the department of creating a circulating medium, and, as a private business, left it absolutely without restraint or control. Any person or association could deal in bullion, could habitually lend money, could receive deposits, discount notes and bills, and with these banking powers could run in debt, borrow money and execute every species of obligation, except circulating notes, just as a private person in any other business could do. *Page 78 
The wisdom of this policy has never been denied; but it remained for the legislature of 1838 to complete the work thus begun. Circulating notes could still be issued only by chartered banks, and no plan had yet been adopted which would both secure their redemption and open the franchise of issuing them. That was the work to which the legislature of 1838 addressed itself. This could only be done by special legislation. The rest had been essentially accomplished by a simple repeal of preëxisting restraints.
At that period (1838) the principles of banking had undergone a thorough discussion both in this country and England. The ablest theorists and writers had asserted the duty of government to exact absolute security for the redemption of the circulating medium, and the policy of leaving banking, in all its other operations, like merchandize a private business. These views prevailed with the legislature of New-York. The preëxisting system, so often amended without any change in its fundamental principles, had fallen in the crisis of 1837. All the forms of special charter, and all the codes and regulations which made up that system, were before the legislature and received a most careful consideration. They were all discarded, and a policy entirely new was adopted. The cardinal point was to render the circulation absolutely secure. This was accomplished by providing for a deposit of mortgages and stocks, dollar for dollar, and by leaving the restraining laws in force as to all issues for currency not thus secured. Connected with this fundamental measure was the policy, adopted by the legislature of 1837, as to other modes of banking, of permitting individuals and associations to issue their notes on giving the required security. This was also done. The next grand idea was to leave banking, in all its other operations, with the fewest possible restraints, and to permit it to be carried on like other branches of business. This too was accomplished. These were the great features of the organic act of 1838, and they were wide departures from all legislation prior to *Page 79 
1837. The currency was wisely guarded with tenfold strictness; and with equal wisdom, in my judgment, banking, in all its other relations to community, was left without a single regulation in the case of individuals, and with scarcely one in the case of associations, except such as belong to the mere mechanism of their formation. Let us look at the frame-work of this act. First we have, in fourteen sections, a system of banking in the particular department of issuing for currency; a system so rounded and complete in itself as to exclude all reference to antecedent legislation. I do not see the possibility of incorporating into it either the provisions or policy of the codes of 1828 or 1829, relating to a system fundamentally different. The residue of the act is summed up in the rules laid down for forming associations; in giving to them certain peculiarities which the courts, and not the legislature, have said transform them into corporations; in granting to them the right, which every individual enjoyed without restraint, of carrying on the "business of banking" by receiving deposits, discounting notes, c.; in limiting the acquisition of real estate, in providing for an examination into their affairs upon cause being shown, and for a periodical statement to be made public for the information merely of all concerned to know their condition. In this grant of power it should be observed that the legislature speak of banking as a business, without including in the definition the power of issuing circulating notes. It is material also to observe that as the law then stood, and was suffered to remain, banking associations (I mean now simple partnerships) might be formed without filing a certificate or following a single provision of this statute, and they could carry on the "business of banking," in all the modes specified, without being subject to a single restriction or regulation. It was necessary to associate in the peculiar manner specified only for the purpose of receiving, from the comptroller, and issuing circulating notes. The government would allow the countersigned *Page 80 
currency only to individuals and to associations which had made and filed their certificate as the act required. But there was no restraint upon the "business of banking," as the legislature defined it, because it could be carried on by private persons and partnerships, as at common law.
Thus, in the simple contrivance of exacting security to be deposited with the government for all circulating notes, and causing them to be issued with the government stamp, we have a paper currency which has been favorably tested now for nearly twenty years. How, it may well be asked, is this contrivance, so simple and efficacious, improved by judicially attaching to it either the provisions or policy of the exploded system? A code of regulations, like the act which took effect in 1828, "to prevent the insolvency of moneyed incorporations," ineffectual as it proved to be, was nevertheless appropriate in a banking system which gave to the circulation no other protection than the solvency of the chartered banks. Such a system could not be too watchfully guarded, for the currency and the bank must go down together. But such regulations are inappropriate to the free banking system, because principles entirely new lie at its foundation. Persons who are not bankers at all may have circulating notes if they will go and deposit the required security for their redemption. So may associations which will do the same, and file a certificate as the evidence of their organization. Private individuals and associations may also, if they choose, carry on the general business of banking in the departments of discount, deposit, c. They may discount with their circulation, or with other capital at their command. If they circulate, they must secure one hundred cents on the dollar; but the idea of preventing the banker's insolvency, which had proved so fallacious, was wholly abandoned. The private banker or the association might be solvent or insolvent — might deal with actual or borrowed capital; but the currency, which is the life-blood of commercial and industrial communities. was rendered *Page 81 
safe. That object being accomplished, the legislature saw no more reason for preventing the insolvency of a banker than of a merchant or manufacturer. We accordingly find, in the new system, no provision requiring the actual payment of capital, none limiting the power of creating debt, none limiting the issues, providing they are secured, none against post notes or time paper, which cannot enter into circulation, and none against contracting in any form in which individuals and corporations may contract. The legislature justly considered it a duty to protect the masses of the community against a debased currency, and there, it was wisely thought, the office of government, in the regulation of banking, essentially ended. That duty was discharged, not by regulations to prevent insolvency, but by securing every dollar of the issues.
Upon this subject views to which I cannot assent have made some progress. The courts began, at an early day, by declaring associations, which had filed a certificate, to be corporations. This was a simple common law necessity, resulting from the peculiarities of a common seal, perpetual succession, c. But this doctrine surely did not, by any legal or logical sequence, draw after it, and incorporate into the banking law of 1838, all or any of the complex machinery of an exploded system. Yet it is true, starting at that point, that, by a mere logic of words, we can, if we will, take in both the act of 1828, to prevent insolvency, and the safety fund law of 1829, and annex them as adjuncts to the system of 1838. I say the safety fund law, for it begins by declaring that "every moneyed corporation, having banking powers, hereafter to be created in this state, shall be subject to the provisions of this act." Associations under the general law, we admit, are corporations, and clearly they have banking powers. We find here a perfect adaptation of words to a result, and that result is, that every free bank in the state must contribute its one-half per cent annually, for six years, to the safety fund; and, by the same reasoning, we car. *Page 82 
adopt the prohibition against post notes, which is one of the provisions of that law. This, I repeat, is a logic of words, but not of ideas. It has never received a judicial sanction, and has never convinced a single mind. We have had the free banks for nearly twenty years, but the safety fund has never received from them any contributions. It has been admitted, without a single exception so far, that the legislature of 1838, in authorizing associations to carry on the business of banking, did not intend to subject them to any one of the provisions of the safety fund act. In the rejection of them all, I find, although some others have not found, conclusive evidence that the policy of each one of those provisions was also rejected.
It is by following, in the same way, mere verbal sequences, that efforts have been made with some success to bring into the free banking system the elaborate act of 1828, to prevent insolvency. But we shall find the difficulties still greater. Some of the provisions of that act are absolutely incongruous and cannot by any ingenuity be made to harmonize with the law of 1838. We have been told by a resolution that we may take them so far as "not inconsistent." (Talmage v. Pell, supra.) What is to be the degree of consistency or inconsistency, and how much ingenuity must be exercised upon each question as it arises, we have not been informed. If we are to take them when not absolutely repugnant, then we must adopt the entire safety fund act also. If this is not the rule, then must we adopt them when they are only slightly repugnant? Even in that case, we must take in also the safety fund statute. I repeat, the difficulties are still greater; for aside from the admitted impossibility of receiving into the system of 1838 many of the provisions of the act to prevent insolvency, c., we shall find that some of them, deemed useful in the working of the free banking associations, were adopted verbatim, and one or two others with modifications. This I hold to be unanswerable proof that the legislature carefully *Page 83 
consulted that statute, adopted all that was thought desirable or useful, and deliberately rejected the residue. This subject might be pursued at greater length, but enough has been said for the present purpose. In the provisions of the Code of 1828, whether we adopt or reject them, it is not pretended that time engagements for the payment of money are prohibited.
IV. If the trust bonds had not been issued before the 3d of June, 1840, when the act of May 14th took effect, which made it unlawful to "issue or put in circulation any bill or note, unless payable on demand and without interest," some questions would arise which have not been discussed. But the evidence shows, beyond any reasonable doubt, that they were issued before that day. [The learned judge here stated the facts in regard to the negotiation of the trust bonds; the pledge of such bonds to the Palmers; the alterations in the form of the deeds, and the substitution of sets of bonds, substantially as stated on pp. 27, and 33-38, ante, and then proceeded.]
Upon these facts, the counsel for the receiver have insisted that all the so-called bonds, which they claim were unsealed instruments, and, therefore, in legal effect, promissory notes, except the one hundred and eighty-seven sold before June 3d 1840, fall under the condemnation of the statute which took effect on that day. It has also been urged that no more than the four hundred and ninety-nine bonds were ever negotiated or sold in pursuance of the trusts, and therefore that the trusts, if not illegal or void in their creation, never became operative as to all the residue of the bonds. It will be seen that both of these propositions are refuted, if the pledge to the Palmers was effectual, according to the intention of the parties, so as to give them a right to hold the bonds until they could be sold; and if they could not be sold at all, then still to hold them and take the benefit of the trusts. *Page 84 
On this subject we do not entertain any doubt. An individual, compelled to raise money to meet his engagements, may execute his negotiable obligation and a trust deed or mortgage to secure its payment. If a lender comes forward who will advance the money for the time the obligation has to run, and take it as absolute owner, the transaction is closed. But if temporary advances are required, before the dealing can be consummated, we see no reason to question the right of the debtor to pledge the instrument, with a power to negotiate and sell it pursuant to the original design, or the right of the pledgee to the benefit of the security. This appears to be precisely the character of the transaction with the Palmers. The bonds had five and seven years to run. They could not be sold fast enough or soon enough to meet the necessities of the bank. The company must have money immediately, and must have it from the Palmers, who were already very largely creditors. In this exigency the bonds created for sale were pledged to that house, with authority to sell and apply the proceeds to the payment of their debt, and especially the new advances. The proceeds of other securities released by them and sold, appear to have been sufficient to liquidate the preëxisting debt, so that they may be regarded as now holding the bonds which remain in their hands in pledge for advances made on the faith of these very transactions. In this branch of the case, therefore, we reach the following conclusions: First. All the bonds having been executed and pledged to the Palmers before June 3, 1840, so that the company could not recall them, were not issued in violation of the statute which on that day became the law of the state, whatever may be the legal character of those instruments. Second. The holders of the four hundred and ninety-nine bonds hold their title under the pledge and the execution by the Palmers of the power to sell. They are therefore entitled to come in under the trusts and share in their benefits, without discrimination between such as purchased before and such as *Page 85 
purchased after the 3d of June. Third. The Palmers, still holding five hundred and fifty-seven bonds under pledges anterior to that day, have the same rights as any other holders, to the extent of their demands. The claims of the Philadelphia banks, or their assignees, holding two hundred and seventy of the half million, and of the Holfords Co., holding twenty-four of the million trust bonds, will be hereafter considered.
V. But the receiver insists that the four hundred and ninety-nine bonds, part of those in the million trust, were negotiated in England, at a usurious rate of interest, and on this ground it is claimed that the trust is void, so far at least as the bonds thus usuriously sold are concerned. This part of the case will now be examined. These bonds, like all the others, bore interest at the rate of six per cent; were negotiated at ninety per cent on their par value; and I assume that, when paid, the lenders will receive a higher rate of interest than is allowed by the usury laws of this state or of England, and therefore that the bonds are void, unless by recent legislation, both here and in that country, the case is withdrawn from the operation of those laws. The statute of this state, passed April 6, 1850 (Session Laws, 334), declares that "no corporation shall hereafter interpose the defence of usury;" and the term corporation is defined in the same act so as to include banking associations. If these bonds are to be regarded as New-York contracts, I am inclined to think that this statute would be decisive against the right of the receiver to allege usury in any stage of these causes, either as a defence to the original bill or as a foundation for his cross bill. My impression is that the act must be construed as a repeal of the statutes of usury as to all contracts of corporations stipulating to pay interest, thus leaving the contracts in full force according to their terms, and that such an act is liable to no constitutional objection.
But however this may be — and the subject is not free from doubt in some of its aspects — it is clear that the legislature *Page 86 
did not intend to repeal, nor could it repeal, the usury laws of England. If these bonds were English contracts, and as such were usurious, it is certain, I think, that our act of 1850 has not relieved them from the taint. The utmost effect we can give to the enactment in that view is, to consider it a simple prohibition upon corporations against interposing the allegation of usury to invalidate contracts governed by the laws of a foreign country. Whether the prohibition could be extended so as to include creditors of corporations in all situations, and all other parties claiming in hostility to the usurious contract or incumbrance, is another question not free from difficulty. The receiver, however, as I have shown in another place, is the immediate representative of the corporation, and as such I incline to think that he is affected by the prohibition to the same extent as the corporation itself. But I propose now to inquire: First. Are these bonds English contracts? and, Second. Are they free from usury by the law of that country? If these questions are answered in the affirmative, then we have no more to do with the statute of New-York.
We are of the opinion that they are English contracts. The circumstances which are decisive upon this point may be briefly stated as follows: The bonds were not intended to be negotiated in this country. This is conclusively shown by the million trust deed, which recites that they were intended to be sold in England. Having been transmitted for that purpose, they were actually sold and the money advanced upon them there. They were made payable in the currency of England and not of New-York. Before they were sold, the parties who actually took them entered into a written agreement with the agent of the company to take, each, a certain number, amounting in all to four hundred and ninety-nine. This agreement was made in London. The interest, semi-annually, during the period they had to run, was, by the terms of the bonds, payable at the house of the Palmers, in London. The place where *Page 87 
the principal was to be paid, I think, cannot be considered as specified, on a strict grammatical construction of the language used, but it certainly was not in New-York; and the legal result is, that the debtor bank must seek the creditor in England, and would be in default if it did not do so at the maturity of the obligation. The holder of each bond had a right, by its terms, to convert it into the stock of the bank on giving notice of his intention at the Palmers' place of business in London, and on surrendering the bond there. In the final trust deed, moreover, we find introduced three trustees residing in England, to whom the three in New-York covenant, on default in payment of principal and interest due upon the bonds, to pay over for the benefit of the bondholders the moneys to be received under the trust. The property embraced in the trust consists of bonds of private persons, secured by mortgages upon lands situated in this state.
These are the essential facts on which the question must turn, and they lead to the plain conclusion that the several contracts of loan, into which the four hundred and ninety-nine bonds enter as a part, are English contracts, and I think this would be so even if the facts tending to that result were less decisive. We may take the single circumstance that the interest is payable in London. The question here is one of interest, solely, and if the rate had not been specified at all, that allowed by the laws of England, in cases where there is no specification, would, most clearly, be deemed the one in reference to which the parties contracted. If, therefore, the actual rate agreed upon will amount in the result to eight or ten per cent, and that is not unlawful there upon contracts of this particular character, but would be, as it plainly was, by the statutes of New-York in force at the time of these transactions, then it is still more plain that the English laws must govern. The lawfulness or unlawfulness of the contract, as determined by the statutes and policy of the country to which we assign the dealing, very commonly *Page 88 
affords a conclusive test in cases of this kind. So, also, we may take the circumstance that the moneys to be received upon the securities held in trust were to be paid over to the three trustees in London, to be received at their hands by the English bondholders. Although the bonds themselves do not appear to specify the place where the principal is payable, yet when we look at this provision of the trust deed, which is a part of the same transactions, and consider, also, that the interest is payable in London, and both principal and interest in sterling money, I think we must hold that England is the place of final payment according to the true construction of the whole contract. So, also, we may rest our conclusion upon the fact that all the negotiations were conducted and the transactions closed in England. In general, the rule is, that if no place of performance is stated, or the contract may be indifferently performed anywhere, it must be referred to the lex loci contractus. If this rule will not always hold, when both the parties, being residents of one country, are temporarily sojourning in another where they contract, it admits, I think, of no qualification when the contract is made in the country where one of the dealers resides, and the other goes there, either personally or by his agent, and there negotiates or concludes the dealing Without discussing this subject more at large, the following authorities may be referred to as decisive: Story on Conflict of Laws, §§ 280, 282, 284, 287, and cases cited in notes; Albion AssuranceCo. v. Mills (3 Wilson Shaw, 218, 233); S.C. Pattison v.Mills (1 Dow Clark, 342, 362); De Wolf v. Johnson (10Wheat., 367); Malpica v. McKown, (1 Louis., 249);Blanchard v. Russell, (13 Mass., 1); 2 Kent's Com., 457, 458, 460, and notes; Fanning v. Consequa (17 John., 511);Scofield v. Day (20 John., 102). It is proper to add, however, that the case of Chapman v. Robertson (6 Paige,
627), decided by Chancellor WALWORTH, has not been overlooked. That decision may perhaps be sustained upon several circumstances which distinguish it from the *Page 89 
present case. The reasoning of the learned Chancellor has, however, been questioned by high authority. (Story's Con. ofLaws, § 293, c, and note.) Whether the case was well decided or not, the conclusion to which we come, upon the facts of the one before us, is in accordance with principles entirely settled.
Were the loans, then, upon the four hundred and ninety-nine bonds, usurious by the laws of England? They certainly were, until the statute of 2d and 3d Victoria, ch. 37, enacted in 1839. This act provided that "form and after the passing thereof, no bill of exchange or promissory note, made payable at or within twelve months from the date, or not having more than twelve months to run, nor any contract for the loan or forbearance of money above the sum of ten pounds sterling," should be void by reason of any rate of interest taken or agreed to be taken. Loans of money upon the "security of any lands, tenements or hereditaments, or any interest therein," are expressly excepted from the operation of the act; and there is another provision limiting the rate of interest to five per cent, as it stood before, in all cases where the parties did not otherwise agree. The statute was to continue in force only until January 1, 1842, a period which included the transactions now in question. The argument on the part of the receiver is, that the four hundred and ninety-nine so-called bonds, in consequence of the imperfect sealing, were, in legal effect, promissory notes having more than twelve months to run, and therefore that they do not come within this statute. If they are not held to be promissory notes, then it is further insisted that the loans were secured upon lands,
and so were excepted from the operation of the act.
We here reach the inquiry whether the bonds were sealed instruments, and as we hold them to be English contracts, that question also must be determined by the law of England. The validity of the seal goes directly to the obligation of the contracts, and, like any other question *Page 90 
of obligation or construction, it belongs to the lex locicontractus and not the lex fori. What, then, is the rule in England on this subject? Lord COKE defined a seal thus: "Sigillum est cera impressa; quia cera sine impressione non estsigillum." If, in his time, mechanical contrivances had come into use, distinctly impressing corporate and official seals upon paper, I think, in the spirit of that definition, he would have held it sufficient; for clearly the impression, and not the wax, according to him, was the fundamental requisite. He did not say "impressio sine cera," but "cera sine impressione," c. In this state it is said there must be wax or some tenacious substance, and we are referred to adjudged cases on the subject. (2 Hill, 227; 3 id., 493; 5 John., 238; 4 Cow., 508; 1Denio, 376.) To meet the doubts suggested by these cases, or to change the rule which, it may be, they affirm long after all reason for the rule had ceased, the legislature, in 1848, passed a statute declaring the impression of a corporate seal upon paper to be sufficient. But the inquiry here is, what was and is the rule in England? and it is thus laid down by SIR EDWARD SUGDEN (Sugden on Powers, 1st Am. ed., 236): "It is not necessary," he says, "that an impression should be made with wax or with wafer. If the seal, stick or instrument used, be impressed by the party on the plain parchment or paper, with an intent to seal, it is clearly sufficient." This authority was referred to and approved in the queen's bench, in the case of The Queen v. TheInhabitants of St. Paul's, c. (7 Adol. Ellis., N.S., 232), LORD DENMAN observing, "we do not wish to encourage the slightest doubt on this point." (Mathews on Presumptive Ev., 36; 2Brown, C.C., 585.) The corporate seal was plainly impressed on the bonds. They are declared on their face to be sealed; they were so intended, so far as we know; they were so accepted by the English holders who advanced their money upon them, and so we must hold them to be. Being each of them for more than £ 10, it follows that they came within *Page 91 
the statute 2 and 3 Victoria, unless their payment is secured upon lands. The security, as we know, consisted of bonds and mortgages upon lands in this state, assigned, by the million trust deed, to the three trustees in New-York. Now those mortgages were all New-York contracts, having no connection with the transactions in question, until so assigned, and by the settled law of this state they were chattel interests merely. For this reason, if for no other, the four hundred and ninety-nine trust bonds were not secured upon lands, and we hence come to the conclusion that, falling within the protection of the statute of Victoria, they are free from the taint of usury. This objection to the million trust deed, therefore, falls to the ground.
VI. The claim of the Philadelphia banks, or their assignees, to the benefits of the half million trust as pledgees of the two hundred and seventy bonds, part of the four hundred and fifty issued under that trust, presents not only the question of usury, but some others of considerable importance.
[The learned judge here stated the facts substantially, as stated at pp. 28-32, ante, and then proceeded.]
Upon these facts the receiver insists, in the first place, that the rate of interest on the loan of $250,000, although in terms six per cent, will amount, when the certificates of deposit are paid, to more than seven per cent on the sum actually received in cash, and therefore that the contract was usurious and void by the laws of New-York. Without examining the question in that light, we hold that the contract must be governed by the laws of Pennsylvania. In all the negotiations, a Pennsylvania loan was evidently, in the contemplation of the parties, to be made in the currency of the Philadelphia banks, and at the rate of interest which prevails in that state. But a more controlling circumstance is, that the contract was to be performed by the company in Pennsylvania, by the payment there of the money loaned. The authorities do not leave this question in doubt. (Story's Con.of Laws, §§ 242, 242 a, 285-7, c.; Dewolf v. Johnson, *Page 92 
10 Wheat., 367; Andrews v. Pond, 13 Peters, 65, 77;Foden v. Sharp, 4 John., 183.) It appears, from the evidence in the case, that the only statute in Pennsylvania establishing the rate of interest, is a colonial act passed in March, 1723, which fixed it at six per cent, and that by a long and well settled course of decision in the courts of that state, a stipulation to pay a higher rate does not invalidate the contract of loan, nor prevent the lender from recovering the principal and lawful interest. Without examining further, this would seem to dispose of the question of usury. The objection on this ground to the half million trust, or rather to the claims of the Philadelphia banks or their assignees, in respect to the two hundred and seventy bonds, is therefore untenable.
But the receiver also insists that the twelve certificates of deposit were promissory notes, and being issued by the banking association after the act of May 14, 1840, took effect, are illegal and void, because expressly prohibited by that act. If this position is sound, and I do not stop to question it, the consequences upon the contract of loan, in part evidenced by those certificates, and upon the half million trust, are to be carefully considered.
It is well to observe, in the first place, that, prior to the Philadelphia loan, this trust had an independent, valid existence. This has already been shown. The four hundred and fifty trust bonds were placed in the hands of the Palmers, as pledgees, in May, 1840, and the trust itself had therefore fully taken effect as the security for those bonds. Now, it is plain that the dealing with the Philadelphia banks, in whatever light we may regard it, did not and could not invalidate the trust. The Palmers, although they parted with two hundred and seventy of the bonds, still retained, and they now hold, the remaining one hundred and eighty. If the pledge of the two hundred and seventy is void for any cause, and the receiver is in a position to assert the voidness, the result is, not that the trust is gone, *Page 93 
but the banks cannot hold the bonds and so share in its benefits. Whether they are to be returned to the receiver, as the immediate representative of the banking association, to be canceled, or revert to the Palmers, as the original pledgees, is another question. If they are to be returned to the receiver and canceled, the trust nevertheless remains until the Palmers are fully paid as the holders of the one hundred and eighty still in their hands; and if the property included in the trust will no more than pay those bonds, it must all be exhausted for that purpose. The trust is a unit. Each bond is secured by all the property placed in trust, and there can be no apportionment so long as the fund is not sufficient to pay all that are outstanding.
The simple inquiry then is, can the Philadelphia banks or their assignees, now in possession of the two hundred and seventy bonds, hold them as security for the moneys loaned to this company, according to the pledge under which they were delivered? If they can, then they are cestuis que trust in respect to the half million trust. If they cannot, then the Palmers are the onlycestuis que trust, either as holders of the other one hundred and eighty or of the whole four hundred and fifty. The solution of this question must depend, in the first place, on the general validity of the contract of loan, notwithstanding the alleged illegality and voidness of the twelve certificates of deposit or written promises to repay the money. It was lawful for the banks to lend the money, and for this company to borrow it, and engage, either verbally or in writing, to repay it at the times agreed on. The only thing unlawful, then, about the transaction was theparticular form in which the engagement was given. Can the corporation, on this ground, repudiate the whole contract, keep the money, and recover back the pledge? Or, if it cannot do all this, then can it annul the pledge on the faith of which the loan was made and recover the thing pledged? These are very grave inquiries. *Page 94 
In the recent case of the claim of Indiana against this same company (4 Kern., 162), where post notes were issued for the price of stocks purchased, we held, upon the fullest consideration, that there was no delictum on the part of the vendor of the stocks, although we assumed that the post notes might be illegal; and we also held that the vendor was entitled to recover the value of the stocks sold. That doctrine disposes of one of the difficulties here. The Philadelphia banks are not to be deemed participants in the offence of issuing a prohibited form of security. There is an especial force in this conclusion, because these banks, as foreign corporations, are not chargeable even with knowledge of the statute on which the alleged illegality depends. Our decision in the case mentioned, it is true, proceeded on the idea of disaffirming the contract of sale, leaving the vendor to recover a quantum valebant, or what the stocks were worth at the time of the sale. The difference between the value and the price agreed on was not material. The price was presumed to be the value. We did not say that the seller wasobliged to disaffirm the whole contract in order to recover at all. In that case it was most strenuously argued, in opposition to the claim of Indiana, that the post notes were illegal and the whole contract therefore void. Without considering whether that position was sound, we held the innocent party was entitled to the value he had parted with, even upon that theory. We certainly did not say that the guilty violator of the law could take advantage of his own wrong, and disaffirm, at his election, not only the notes but the contract in all its parts. In that case, disaffirmance accomplished exact justice, because there was no special security for the demand. If this case is determined upon the same theory, we not only permit the wrong-doer to elect to disaffirm, but the pledge, on the faith of which the money was loaned, must fall with the contract; and although an implied assumpsit may remain to *Page 95 
restore the money, the debt, now amounting to a half million of dollars, is of very trifling value.
There are in the books many cases which assert the right of the more innocent party to disaffirm an illegal contract, and so recover back, on an implied assumpsit, the money or value advanced. These were relied on in the Indiana case for the particular purpose of showing that the claimant was not within the influence of the maxim "in pari delicto," c. His right to relief was contested upon the force of that maxim; but principle and authority, as we said, agreed in denying its application to such a case. Now, those cases are liable to mislead us here unless we discriminate with some care. The distinction will be seen at a single glance. They are all cases where the plaintiff had no title to the money if the contracts were allowed to stand, and where the defendant had a right to hold it by the very terms of the contract. Hence, there was no possibility of relief except through an unqualified disaffirmance. For example in the earliest of those cases (Smith v. Bromley, Doug., 696), the plaintiff had paid to the defendant £ 40, to induce him to sign a bankrupt's certificate, and the action was brought to recover the money back. Clearly the plaintiff could have no title to the money except through the absolute invalidity and a disaffirmance of the whole contract, because, by the very terms of that contract, the defendant was entitled to retain it. So in Jaques v.Golightly (2 W. Bl., 1073), the action was brought to recover money paid for illegally insuring lottery tickets; and there, too, relief was, in the very nature of the case, impossible until the contract was wholly disaffirmed. This precise principle runs through all the cases where illegal transactions have been disaffirmed. It will be found that in all of them the contracts themselves, if lawful and valid, stood directly in the way of the action. But here the broad difference is, that the Philadelphia banks can recover, and seek to recover, the money lent without a disaffirmance, and upon the very terms of the *Page 96 
lending contract. The alleged illegality of one of its parts is the objection to their claim, and not, as in the cases referred to, the very foundation on which it rests. They do not seek to disaffirm, because they need not do it in order to recover. If the contract is void in all its parts, then it is true there is nothing but an implied assumpsit left; but even then they will recover, not through the illegality but in spite of it. In this case, in short, the claim is resisted on the voidness of the contract, while in those which have been mentioned, it was asserted on that very ground.
What, then, is the precise question now before us? It is. I apprehend, whether the contract of loan made between this company and the Philadelphia banks is void, for the particular reason that in one of its incidents the company exceeded its powers or violated the statute, the lending parties being innocent both in fact and in judgment of law What was the contract? On the part of the banks it was to loan $250,000, and on the part of the borrower to repay the money at certain periods, and to secure the debt by a pledge of certain securities. This is exactly what was agreed on, but, as the evidence of the promise to pay at the times specified, post notes were issued in a form prohibited by law. There was no other illegality in the transaction, and, as far as the lenders are concerned, even the notes were not illegal. As to them, they were merely worthless and void. I assume such to be the logical result of the prohibition upon the borrower against issuing them, but there is no other result. It is a mere voidness, and not a contamination which spreads itself over the whole contract.
Now, a doctrine which is expressed in the words "void in part, void in toto," has often found its way into books and judicial opinions as descriptive of the effect which a statute may have upon deeds and other instruments which have in them some forbidden vice. There is, however, no such general principle of law as the maxim would seem to indicate. On the contrary, the general rule is, that if the *Page 97 
good be mixed with the bad it shall nevertheless stand, provided a separation can be made. The exceptions are: First. Where a statute, by its express terms, declares the whole deed or contract void on account of some provision which is unlawful; and, Second. Where there is some all-pervading vice, such as fraud, for example, which is condemned by the common law, and avoids all parts of the transaction because all are alike infected. The alleged invalidity of the contract, now under consideration, depends wholly upon the statute of May 14, 1840, but that prohibits the post notes only and not the contract itself. The legislature did not even declare the notes to be void, but only forbid banks to issue them under a penalty.
The principle which upholds this contract is powerfully supported by a series of decisions in this state, known as the Utica insurance cases. (Utica Insurance Co. v. Scott, 19John., 1; Same v. Kipp, 8 Cow., 20; Same v. Cadwell,
3 Wend., 296; Same v. Kipp, id., 369; Same v.Bloodgood, 4 Wend., 652.) In all these cases the Utica Insurance Company had taken notes in a course of unauthorized banking. The restraining act then in force (2 R.L., 234) declared that all notes and securities for the payment of money, made to any association, institution or company not authorized as aforesaid, should be null and void. It was held that the corporation, having violated the statute and transcended its powers, could not recover on the notes it had discounted, but could recover on the contract of loan, being authorized by its charter to lend its surplus funds. The court, in each of the cases, affirmed the distinction between the lending contract and the security which the statute had declared void. In one of them (8 Cow., 20), the supreme court said: "It was unnecessary for the act (the restraining law) to go further than to avoid the security taken, thereby depriving the association of the means of effectual operation. True, it was competent for the legislature to have avoided the contract also. But they have not done so." And again it was observed: "This *Page 98 
suit cannot be said to arise out of an illegal contract which defeats a recovery. The illegal contract, if any, was not the loan, for the plaintiffs had the right to loan money to the defendant, but it was the agreement to secure the loan by a note discounted. Avoiding what was illegal does not avoid what was lawful." In what was also observed concerning a disaffirmance of the illegal contract, the illegal security was plainly intended. Now these cases have been questioned in the court which pronounced them, and it seems to me there is great difficulty in sustaining them, for the particular reason that the violator of the law was allowed to recover upon the very contract in which the violation consisted. The restraining act not only declared the notes void, but in terms made it unlawful to discount them; in other words, to lend money in that particular mode. Nevertheless, the distinction between the loan and the security taken therefor was drawn with great perspicuity, and in that respect I am not aware that those cases have ever been questioned. Indeed, the distinction had been settled long before in England, in Robinson v. Bland (2 Burr, 1077). The action was for money lent, and on a bill of exchange. The plaintiff had won money from the defendant at play, and had also lent him another sum at the time and place of play, and the bill was drawn by the defendant to include both sums. The statute on the subject declared that all notes, bills, bonds, c., or other security
for money lost or money lent at play, should be absolutely void, but did not forbid the lending. The case was elaborately considered by Lord MANSFIELD and his associates in the court of king's bench. It was held, that although the statute declared the security void, there was nothing unlawful in the loan, and therefore the money lent might be recovered. The legislature, it was said, intended to avoid the security merely, but not the contract of loan. Mr. Justice DENNISON observed: "There is a distinction between the contract and the security." Justice WILMOT said: "As to contracts *Page 99 
being good and the security void, the contract may certainly be good though the security be void by the statute."
There is another class of cases, arising under the British stamp acts, which seems to me entirely in point. In Cundy v.Marriott (1 B. Adol., 696), the action was on a bill of exchange, and for goods sold. The defendant bought goods of the plaintiff, and gave in payment an unstamped bill. The instrument was not only void, but by the stamp act it was a penal offence to issue it. But the plaintiff recovered on the contract of sale. (Wilson v. Vysar, 4 Taunt., 288; Chitty on Bills, 12thAm. ed., 144, 145, and notes.) Many other views of this question might be urged, but in further illustration I will only refer to the familiar doctrine that the lending banks might bring their action for money lent without noticing the securities, even if they were of unquestioned validity. The contract could be proved without the notes. If it appeared that they had been given, it would only be necessary to produce and cancel them at the trial. A fortiori, could this be done if the notes are simply void, and they are at most only void as to the innocent lenders? In that view, it would not even be necessary to produce them at all.
VII. I come, then, to the conclusion that the loan of the Philadelphia banks to this company, was, in all respects, a valid contract, to be performed according to its terms. The question now to be considered is, whether the pledge of the two hundred and seventy half million bonds is also valid as a special security for such loan. On this point I do not entertain a doubt. If we uphold the contract we must uphold the pledge also. The only argument tending to a different conclusion is derived from the written agreement, executed contemporaneously with the loan, which declares, as we have seen, that the two hundred and seventy bonds are to be held as collateral to the twelve certificates of deposit. The certificates being illegal and void, it has been urged that the pledge must full with them. The answer is *Page 100 
that the loan, of which the certificates were intended as in part the evidence, being a legal and valid contract, sustains and upholds the pledge. The very agreement in writing, on which the whole argument is based, shows, with the utmost clearness, the fact of the loan, the terms of the contract, and that the certificates were given to secure the repayment of the money at the times specified. The extrinsic evidence also establishes the fact that the loan was made in special reliance upon the two hundred and seventy bonds as collateral, and I am confident there is no principle or authority which can disturb the security, unless we also annul the whole contract.
To what, it may be asked, does the law annex this pledge? Is it to the debt for the money lent, or to the particular form of the instrument which is the evidence of such debt? Most clearly to the former. Such is the just construction of the agreement, and such is the judgment of the law upon the nature of the transaction. This may be tested by rules and analogies which are quite familiar. No one will doubt that a release of the debt would extinguish the post notes and the pledge also, although not mentioned in the instrument. It is just as clear that the post notes may be lost, destroyed or surrendered without affecting the debt or the security therefor. So, if the two banks should make a written assignment, reciting the loan and transferring their demands, it is plain that the certificates and all the securities held would pass without specification. A mortgage may be given, conditioned in its terms, to pay a note or a bond. The note or bond may be canceled without impairing the lien. So the lien would hold if the note or bond recited were in fact not executed, the intention being to secure an actual debt. In this very case, if, by accident or mistake, the post notes had not been delivered, is it possible to doubt that the pledge would, nevertheless, be good? and if it would be, can the result be different if the notes are simply void? I have before shown that it is their voidness only *Page 101 
which can affect the rights of these unoffending parties. Theirillegality concerns only the corporation which issued them and violated the law in so doing.
There is no occasion here to reform the written instrument which expresses the terms and object of the pledge. It only is necessary to consider the nature of the transaction and fairly interpret the language of the contract. If we do this, it is impossible not to see that the end which all the parties had in view was to secure the debt for the money lent. The amount of the debt and the times of payment were expressed in the post notes. It was convenient language, therefore, to say that the two hundred and seventy bonds should be held as collateral to those notes. But in the same instrument the existence and cause of the debt were disclosed. The notes were merely the representatives of the debt, and no pledge could be possibly given to secure the one without securing the other also. If it were true that the terms of the pledge confined it to the notes, the law, nevertheless, instantly annexed it to the debt. I think these principles are elementary.
This question, although it would seem a very plain one, is nevertheless supposed to be embarrassed by the decision of this court in Leavitt v. Palmer (3 Comst., 19). That decision, very probably, proceded in part upon views of illegality, and its consequences as affecting the entire transaction, somewhat stronger than we might now feel inclined to sanction. But the cases differ widely. If they did not differ, we might be led to believe that principles quite familiar had somehow been overlooked. Let us note some of the points of distinction. In that case, this same company had issued to the Palmers, after the prohibitory act of May 14, 1840, forty-eight promissory notes, and created a trust to secure their payment. In the present case, on the contrary, although the notes may be void, the trust is not collateral to them and does not fall with them. The two hundred and seventy bonds were valid (that has already been shown), *Page 102 
and the trust is collateral to them. Both had a valid existence prior to this transaction. So that the only question here is, whether the bonds were effectually pledged to the banks, entitling them to share in the trust fund. This is one distinction; another is, that in Leavitt v. Palmer, the forty-eight notes and the trust deed were, essentially, the whole transaction. There was no loan or advance of any kind on the faith of the trust. The transaction might be annulled, and the parties would be, as in fact they were, left in exactly their previous relations to each other. The intention of the notes was to assume an antecedent liability of a third person to the Palmers, and to convert the contingent liability of the company into an absolute one. The trust was declared to be collateral to the notes, but if those were void there was no debt to feed and sustain it. Here, on the contrary, was a loan predicated on the very pledge itself. The bonds were agreed to be delivered for the purpose of obtaining the loan. The certificates were the most unimportant part of the transaction. Whatever may be their fate, the contract stands according to its terms, and that is what the parties intended to secure by the pledge. There is still another and marked difference. In the case cited, the notes were intended to have a circulation and to pass into other hands than the Palmers; and one of the objects of the trust was to promote such circulation, instead of simply securing the Palmers' debt. This was evident from a memorandum at the foot of the notes, and from the provisions of the trust deed. As Judge BRONSON remarked, "the trust was not created for the security of the Palmers alone, but after default in payment (of the notes), the trustees were to stand seized of the assigned securities in trust for the holders, and were to pay over the moneys unto the Palmers or any other parties who may be holders," c. He added, "other parts of the instrument show that the certificates were intended to pass beyond the hands of the payees." In such a case there were reasons for saying that the trust deed, intended expressly to give *Page 103 
"credit and circulation" to the illegal notes, must share the same fate with them, which have no application to the question before us. Such was not the design of the pledge of the two hundred and seventy bonds. The contrary will very clearly appear on inspecting the agreement which has been referred to. We find, on the whole, nothing in the case of Leavitt v. Palmer to prevent the conclusion that the Philadelphia banks, or their assignees, are entitled to hold the two hundred and seventy bonds, and consequently to come in under the half million trust, and we accordingly adopt that conclusion as the only one which reason or authority will justify.
VIII. In respect to the claims of the Holfords Co., as holders of twenty-four of the million trust bonds, it has already been observed that in May, 1840, they took them by transfer from the Palmers, who held them in pledge. They therefore have the Palmers' rights. It appears to be well settled that a pledgee may transfer his interest in the things pledged, even without the consent of the pledgor, and for his own debt. (Story onBailments, 214, 218.) I suppose the title of the transferee or second pledgee cannot be any weaker if the transfer is made with the consent of the original pledgor, and the consideration is a debt due from him. If this is not a satisfactory view on the subject, the alternative is that the Palmers virtually surrendered their own claim upon the bonds, and that the company repledged them to the Holfords. In this alternative, I think the result is the same in regard to the rights of the receiver. Although the bonds were made for sale, and although the trust deed declared that to be the object in view, I see no reason why they could not be temporarily deposited with a creditor as security until a sale could be made. The pledge implies a power to sell and receive the money in satisfaction of the debt. In so pledging them there is certainly nothing which contradicts the terms of the trust or defeats its object. A sale was the ultimate purpose of the whole scheme. A pledge until that should *Page 104 
be effected, so far as I can see, is no diversion of the trust for a different object, nor does it even delay the attainment of that purpose.
It has been suggested, however, that, inasmuch as these twenty-four bonds were pledged to the Holfords to secure a preëxisting debt, they are not purchasers for a valuable consideration, and so not within the saving clause of the 8th section of the statute to prevent the insolvency of moneyed corporations. If the trust deeds could be sustained only on the ground that the holders of the bonds purchased them for a valuable consideration and without notice, within that clause of the statute, then there might be a question on the rights of these men. But it has already been shown that the validity of the trust deeds rests firmly upon another ground: I mean the express sanction and authority of the corporation.
The point was made upon the argument, that the Holfords suffered the cross bill to be taken as confessed, and hence that they are entitled to no relief. The fact is true as stated. But the allegation of the cross bill, so far as they are separately concerned, is merely that the twenty-four bonds were delivered to them as security for an "alleged preëxisting indebtedness," and this they confessed by not answering. Their debt, it will be seen, is not controverted; and its preexistence, as we have shown, is no impeachment of their title. The trustees representing all the bondholders have answered, and all the questions which go to the general validity of the trusts and of the bonds are controverted and must be determined between them and the receiver. If the special allegation, directed against the particular claim of the Holfords, is in law no impeachment of their rights, they have lost nothing by not answering it.
There is one other suggestion which may be due to this comparatively unimportant branch of the case. If the title of the Holfords to the twenty-four bonds fails, the result is, either that the bonds revert to the Palmers from whom they *Page 105 
received them, or that they must be surrendered to the receiver to be canceled. In the first alternative, the trust itself will not be affected in the slightest degree. In the second, it will fail as to these particular bonds, but will stand entire as to the remaining eight hundred and seventy-six of the original nine hundred.
The payment or cancellation of a portion of the bonds will not subtract from the fund until all the residue are paid. Now, as I understand the evidence produced by the receiver in endeavoring to make out the insolvency of this company, the effects held under the trusts are somewhat less than sufficient to pay the bonds after withdrawing the twenty-four in the hands of the Holfords. In this view, the general creditors can in no event receive anything out of this fund, and the question as to the Holfords' title, therefore, concerns the other bondholders only.
The point was taken by the receiver's counsel, although but very little discussed, that the Philadelphia loan was "illegal as to the Bank of the United States, that institution being expressly forbidden, by its charter, to take more than six per cent." Without suggesting other answers to this point, it will be sufficient, I think, to observe that no such objection is taken in the receiver's bill. If it were intended to raise such a question, the charter of the bank, being a statute of another state, should have been set forth as a fact, and then that it had been violated in the transaction. Not having done so, this question cannot now be raised. It appears to be raised now for the very first time. I do not find any such point among the very great number which were presented on the hearing in the court below.
It appears that one hundred and thirty-five of the two hundred and seventy bonds delivered to the Philadelphia banks, are held by the defendants, the Morrisons, by transfer from the Bank of the United States, which, jointly with the Girard Bank, made the loan of $250,000. The Morrisons, therefore, are the claimants under the half million trust in *Page 106 
respect to so many bonds as they hold; but their claim is objected to on the ground that they do not appear to be assignees of any portion of the loan or debt to secure which the two hundred and seventy bonds were pledged. If the fact be so, we think the objection is unsound in law. A pledgee may transfer his interest in the subject of the pledge without assigning the debt. The alienee will take such interest and no more, subject of course to the pledgor's right of redemption. (Story onBailments, 214, 218, and cases cited.) If this were otherwise, the one hundred and thirty-five bonds would revert to the Bank of the United States, and in that case it would be material to inquire whether the rights of that bank are cut off by failing to answer the cross bill. But, in the view we take, such an inquiry is unnecessary.
I have so far considered all the objections which this corporation, if no receiver had been appointed, could urge against the validity of the two trusts or the title of the various parties who hold the trust bonds. In respect to all these grounds of objection, the general creditors are in no better situation than the corporation would be if it had not been dissolved. If the receiver can repudiate the trusts, as the immediate representative of the corporation, of course the creditors will take the fruits of such repudiation; but if it has been shown that he cannot repudiate them in that character, then they have no ground to stand upon until we come to objections of another class.
But suppose these trusts were void for any one of the reasons which have been considered. If we had come to such a conclusion, we should meet another question which appears to me to be one of very great importance. The receiver, it is to be remembered, thus far stands in the shoes of the North American Trust and Banking Company. Can, then, that corporation allege the invalidity of its own acts, and annul these trusts, after receiving a full consideration therefor, without restitution to the bondholders who acted *Page 107 
solely in reliance upon the securities pledged? The principle of equity, which requires such restitution as the condition of relief, is of almost universal application. Can, then, a corporation come into a court of equity, alleging that in a conveyance of its property it has exceeded its powers and violated the law, and so repudiate the transaction and recover the fund, without restoring the consideration it has received? If it can do so where both parties are equally guilty, and that may well be denied, can it where those with whom it has dealt are both in fact and in judgment of law innocent. These are inquiries which were suggested on the argument, and it seems to me that they deserved an answer, if any could be given. But no answer was attempted, and with what reflection I have given to them, I confess that none has occurred to me. In respect to one of the questions which have been considered, I mean that of usury, if we held that the bonds, or any portion of them, were New-York contracts, and usurious under our statutes, it is true the corporation, as the "borrower" might, under the peculiar provisions of the act of 1837, obtain relief without the equitable terms of paying the lawful debt and interest. But in respect to this particular question, the receiver has even less than the rights of the corporation. Creditors have no such unconditional right to relief, under the act of 1837 (Rexford
v. Widger, 2 Comst., 131; Post v. Bank of Utica, 7Hill, 391), and the rights of creditors alone are to be considered, because their claims, as we have seen, will exhaust the entire estate, whether it be more or less. In respect to all the questions so far examined, except that of usury, they have no greater rights than their debtor. In reference to that, they have less: and such is the situation of the receiver in both respects. In virtue of his office he has the title of the corporation, but as trustee of that title for creditors only, he can assert it only upon conditions by which creditors would be bound. The peculiar rights of the "borrower" upon usury, are given to him in the statute of 1837, for his *Page 108 
own benefit, and no court can allow them to be asserted, contrary as they are to the settled maxims of equity, by a party in succession to him, when it is clearly seen that such party holds the title for the benefit of others.
It only remains now to consider a different class of objections to the two trusts proceeding, on the grounds of fraud upon the rights of creditors, or of illegal preference between them. These are unavailable to the corporation, but it has been conceded that the creditors may, through the receiver, invalidate the trusts, if the objections are well taken. They are three in number: First. That the trusts were created by the corporation, "when insolvent, or in contemplation of insolvency, and with intent to give a preference to a particular creditor over other creditors," in violation of section nine of the "act to prevent the insolvency of moneyed corporations;" Second. That they were made "in trust for the use of the company," and so are void as to creditors, under 2 R.S., 135, § 1; Third. That they were made with intent to hinder, delay or defraud creditors. These will now be examined in the order stated.
I. It has already, for other purposes, been assumed that banking associations are subjected to so many of the provisions of the statute referred to, concerning moneyed corporations, as are "not inconsistent" with the general law of 1838. I have pointed out, in another place in this discussion, the utter inconsistency of the two systems of banking, but if they can be united anywhere, it can quite as easily be done upon the ninth section, against preferences, as any other. I shall not, therefore, change the assumption on which we have so far proceeded.
The language of the statute is "No such conveyance, transfer, payment, c., by any such corporation, when insolvent or in contemplation of insolvency, with the intent to give a preference to any particular creditor over other creditors of the company, shall be valid in law." It is obvious, and is not denied, that to bring a transaction within *Page 109 
the statute, the intent to give a preference is a fundamental requisite. This is a fact to be alleged and proved like any other fact, which lies at the foundation of the relief sought, and from this it must follow, that so long as the debtor corporation, notwithstanding the pressure of great embarrassments, entertains an honest expectation, in the exercise of a reasonable intelligence, of going on with its business and paying all its debts, its acts cannot be brought within the operation of this statute. While this expectation is entertained in sincerity and good faith, it may lawfully secure a particular creditor, or sell or pledge a portion of its assets to raise money to meet its necessities.
Provisions similar to this one have existed in the English and United States bankrupt laws, and in the insolvent laws of various states, and they have often come under the consideration of the courts. There is, therefore, in the books, no want of adjudged cases bearing with much directness upon this question. I shall not go over these cases. A few citations will be sufficient for the present purpose. In Fidgeon v. Sharpe (5 Taunt., 544), arising under the English bankrupt act, this doctrine was laid down as the test by which the acts of one becoming a bankrupt must be adjudged: "It must be an act, then, not only that in effect contravenes the bankrupt laws, but it must be done with intent to contravene them, and in contemplation of bankruptcy. The innocence or guilt of the act depends on the mind of him who did it, and it cannot be in fraud of the bankrupt laws, unless the actor meant it should be so." In Crosby v. Crouch (11East, 261), Lord ELLENBOROUGH observed: "Two things are necessary to concur, in order to avoid a delivery of the goods, namely, the purpose of a voluntary preference in respect to such delivery, and the contemplation of bankruptcy at the time the goods were delivered."
In Everett v. Stone (3 Story, 453), Mr. Justice STORY observed: "In short, contemplation of bankruptcy means a contemplation of becoming a broken up and ruined trader, *Page 110 
according to the original signification of the term; a person whose table or counter of business is broken up, bancus ruptus. In such a case, if the bankrupt makes a conveyance giving a preference to certain creditors, that is the very thing which the bankrupt act denounces and declares a fraud," c. In Arnold v.Maynard (2 Story, 354), the same judge, while condemning a mortgage as given to prefer a creditor in violation of the United States bankrupt law, said: "I agree that the mere fact of a man's being insolvent does not necessarily establish that he means to stop business and break up his establishment; for he may hope and believe that he can still carry it on and perhaps redeem himself from insolvency. But when he is deeply in debt, and intending to fail and break up his whole business at once, he makes a conveyance to a particular creditor to give him a preference over all the rest, it seems to me irresistible evidence that he does the act in contemplation of bankruptcy." InJones v. Howland (8 Metc., 377), a case which underwent a careful consideration, the decision of the supreme court of Massachusetts is fairly stated in the reporter's head note, which is as follows: "If a party who fears or believes himself insolvent, but does not contemplate stoppage or failure, and intends to keep on and make his payments and transact his business, hoping that his affairs may thereafter be retrieved, and in that state of mind makes a sale or payment without intending to give a preference, and as a measure connected with going on in his business, and not as a measure preparatory to or connected with a stoppage in business, such sale or payment is not void as made in contemplation of bankruptcy, within the meaning of the second section of the United States bankrupt act of 1841, though he immediately afterwards becomes bankrupt." The doctrine to be derived from the authorities cited is sustained by many other cases. (Ashby v. Steere, 2 Woodbury Minot,
354; in re Pearce, 21 Verm., 611; Jones v. Sleeper, 2N.Y. Leg. Obs., 134; Freeman v. Deming, 3 Sandf. Ch. R.,
332; Taylor v. Blackmore, 5 Humph., 342; Wilkinson'sappeal, 4 Penn. *Page 111 
288; Mitchell v. Gossam, 12 Ohio, 335; Crawfords v.Taylor, 6 Gill John., 330, 333.)
Now, it has been strenuously urged that when these trusts were created the banking company was insolvent, within some definition of that term, or, at all events, that insolvency was feared and contemplated. But the true question is one of intention and motive. Was it the design of the trusts to make a partial distribution of assets amongst the creditors, or was the expedient of creating them resorted to for the purpose of raising money to pay debts, and with the bona fide expectation of removing difficulties and averting insolvency? I have looked with some attention into the evidence in the case, and can come to only one conclusion. This company was certainly under very great and alarming embarrassments for want of cash means to meet its rapidly maturing engagements, but its officers did not believe, and I think then had no reason to believe, that its resources were not amply sufficient for the ultimate payment of all creditors. They also believed, so I feel compelled to say upon the evidence, that the moneys to be raised by the successful negotiation of the trust bonds would relieve their institution and enable them to meet all demands upon it. If these are correct conclusions of fact, then the trust conveyances do not fall within the condemnation of the statute. It is an important fact that the company did go on paying its debts, as they matured, for many months after these trusts were created.
It has been urged that the debtor corporation must be deemed to have intended the result of its own acts. This is very often a useful rule of evidence in arriving at a conclusion upon a question of motive and intention, but it is not a rule of law. If a given result must, by plain and absolute necessity, follow from a particular action, or if it be so likely to follow that no two minds of equal intelligence could differ in conclusion, viewing the subject from the same point of observation as the actor himself, then there would be no injustice in holding that he intended such result. Still the *Page 112 
question is one of fact; what was the intent? What it was, is by no means uniformly proved by the result. On this point, the observations made by Judge HUBBARD, in the supreme court of Massachusetts (Jones v. Howland, supra), are eminently just: "When we look back upon events that have happened, we stand in a different position. We behold with a clearer vision, as we embrace within our glance the beginning and the end, the act and the consequence. But the man who is doing the act may contemplate a very different result. His judgment may be biased by his wishes." "Disappointments may also take place which were not anticipated. The experience of others is rarely guide to an embarrassed man."
Full justice to this question, perhaps, requires that it should be presented in another light. I think we cannot say, upon the language or intention of the statute under consideration, that it includes, under any circumstances of insolvency, actual or contemplated, a security given for a loan or advance in cash where no other relations exist between the parties. The preferences condemned are those made between the existing creditors of the corporation, where the one preferred, if he loses his security, is in no worse situation than before. Equality among those having equal claims, was the evident policy of the legislature in enacting this law. If it had been the intention to include a cash loan, secured by a mortgage or a trust, then I think that, in accordance with all the analogies of the law, there would have been a saving clause in favor of the dealer having no notice of the insolvency of the corporation. We find such a clause in the previous 8th section, avoiding conveyances, c., not authorized by a previous resolution of the directors. Its absence in the 9th section tends very much to strengthen the conclusion that such transactions are not within the intention of the statute, as I think they are not within the fair interpretation of the language used. If this is a correct view, the result follows that the two trusts, regarded as *Page 113 
made simply to secure the persons in England, or elsewhere, who should purchase the bonds in market and advance their money thereon for the use of the corporation, are free from objection under this statute. It is true that a corporation, insolvent or contemplating insolvency, may create a security for the purpose of raising money in order to distribute it by preferentialpayments among its creditors. But in such a case it is the payments which the statute avoids, and not the security on which the money is raised. Preferential payments are not in question in this case.
When, however, these trusts were created, there was a collateral design to pledge the bonds, until a sale could be made, to the Palmers, not only for future advances but for the very large debt which had already accrued in the dealings with that house; and this, as we have seen, was actually done. The question can therefore be made under the statute, whether one of the objects of the two trusts was not, through the pledge, to give to the Palmers an illegal preference of their debt over other creditors; and, according to the construction we have just indicated, no other question of illegal preference can possible arise upon the facts of the case.
Were, then, the trusts made in order to pledge the bonds, with intent thereby to prefer the Palmers' debt, in violation of the statute? In this point of view there is still less difficulty in overcoming the objection; for, aside from the general facts of the case, indicating, as we have before said, the absence of design to give illegal preferences to any creditor or party, there are some special facts which are still more decisive, if the only question is, as we think it is, upon this pledge. In regard to the million trust, the inquiry must be referred to a period as early as some time in February, 1840, because the second trust deed and series of bonds then took effect, embracing in the scheme all the securities afterwards included in the final trust. These bonds, as we have seen, were held under the pledge; but to facilitate their sale *Page 114 
and remove special objections to that scheme, the final trust and bonds were substituted early in May, and to these the same pledge would attach without any new arrangement. Now in February 1840, the Palmers held, as security for their debt, state stocks sufficient to cover the entire amount. And if their debt was already secure, how is it possible to infer a design to prefer them through the trust? Then as to the half million trust: this was a separate scheme, matured about the 1st of May. At that time the Palmers had surrendered a large portion of the stocks, but in their place they held the million trust bonds, so that their debt, although increasing, was still secure. The half million bonds were, moreover, pledged with a particular design of procuring new acceptances to the amount of £ 70,000. We come, therefore, to the conclusion, both upon the general and these special facts of the case, that the two trusts did not violate the statute referred to.
II. The next question is, whether the trusts are void as to creditors, on the ground that they were made "in trust for the use of the corporation." This objection rests upon certain reservations contained in the trust deeds, and upon a doctrine which was laid down by Judge BRONSON, in the case of Goodrich
v. Downs (6 Hill, 438), determined in the supreme court of this state. In that case the question was upon the validity of an assignment made by a failing debtor, against whom judgment had been recovered, on which execution was about to issue, of the mass of his property, being personal estate, for the benefit of part of his creditors, but reserving to the debtor the surplus which should remain after paying the debts specified. The assignment was held fraudulent and void, Justice BRONSON delivering the opinion of the court; and I do not see any reason to question the soundness of the decision, if we may understand it to rest distinctly on the ground of fraud. But the learned judge went on to say: "The cases which have been mentioned also hold that where a deed is void in part, as *Page 115 
being contrary to a statute, it is void in toto. Now, here the legislature have not only declared that every conveyance made with intent to hinder, delay or defraud creditors, shall be void (referring to the statute against fraudulent intents in alienation of property, 2 R.S., 137, § 1), but they have added that every conveyance of goods, c., in trust for the use of the person making the same, shall be void as against creditors (referring to 2 R.S., 135, § 1). So far as relates to the surplus, after paying the preferred creditors, the case falls within both branches of the statute; and the deed being void in part, the whole instrument must fall to the ground." In another part of the opinion, speaking again of the statute last mentioned, he observed: "But there is another statute which provides that all conveyances of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against the creditors of such person. There is nothing here about the intent with which the deed was made, and neither court nor jury has anything to do with the question," c. The doctrines embodied in these extracts, although not indispensable to the decision of that case, are thus laid down with a sanction certainly not to be lightly disregarded. If they can stand the test of examination, they are, beyond all doubt, fatal to these trusts. The principles declared are: First. That every conveyance of personal estate, for whatever object, if it contain any reservation of use or benefit to the grantor, is within the statute against conveyances in trust for the use of the person making the same; Second. Being thus void in part the whole is void; Third. The intent of the party making the conveyance, however meritorious, has nothing to do with the question. I say these principles, if sound, are fatal to the trusts, because they contain certain stipulations and reservations in favor of the corporation which created them, among which, and the chief of which in importance, so far as this question is concerned, is a trust to hold the property for the use of the corporation, and subject to its order, after *Page 116 
the trust bonds should be paid. Upon the most attentive consideration, we think that these propositions, if not each of them unsound, are certainly so in their agregate result and influence upon instruments of the class to which they were applied in the case cited.
They are, in the first place, unsustained by the authorities to which we have been referred. Before Goodrich v. Downs was decided, not a few cases had arisen in this state which involved the validity of instruments conveying a debtor's property in trust, with some use or advantage reserved to himself, and in most of those cases the instruments were set aside. (Murray v.Riggs, 2 John. Ch. R., 572; S.C., 15 John., 589; Hyslop
v. Clark, 14 John., 458; Seaving v. Brinkerhoff, 5 John.Ch. R., 329; Austin v. Bell, 20 John., 442, 450; Mackie
v. Cairns, Hopk., 373, 404; S.C., 5 Cow., 548;Wintringham v. Lafoy, 7 Cow., 736; Grover v. Wakeman, 4Paige, 23; S.C. on appeal, 11 Wend., 187.) In all these cases the conveyances had been executed while both the statutory provisions (with immaterial differences in phraseology) which have been referred to were in force. Indeed, it should be observed that the statute, against trusts in personal property for the use of the persons creating them, had been enacted in England as early as 1487. In this state it had been reënacted in 1787. It is now, as we have seen, incorporated in the revision of 1830, with some difference of language of no importance to the present question. Now, in most of the adjudged cases which have been cited, the conveyances were held void by reason of provisions contained in them for the use and benefit of the grantor, but on a careful examination we shall find that in no one of them was the decision influenced by this statute. The inquiry uniformly was whether the debtor had attempted to place his property beyond the reach of his creditors, with a fraudulent design, contrary to the other statute which has been referred to, and to the principles of the common law. In the prosecution of that inquiry the cases are not entirely uniform in reasoning *Page 117 
or result. But nowhere shall we find the proposition stated that this statute pronounces a total condemnation of all conveyances and dispositions of personal property containing any provision for the use of the debtor. Indeed, I do not find that, in the many very able and elaborate opinions pronounced by judges in the cases cited, this particular statute was more than once mentioned. In Mackie v. Cairns (5 Cow., 580), Chief Justice SAVAGE quotes it without comment; quoting, also, at the same time, the statute against conveyances made with intent to defraud creditors, which had been enacted in this state at the same time with the other, and like it was derived from the legislation of the parent country. That case itself, like the others cited, was determined distinctly on the ground of fraud.
In England, as we have seen, this statute was enacted, now three hundred and seventy years ago, but I am confident we can find there no trace of the peculiar doctrine of Goodrich v.Downs. In Estwick v. Caillaud (5 Term R., 420), Lord ABINGDON had assigned part of his real and personal estate in trust, first to pay expenses, next half of the surplus to himself, and then the residue to certain of his creditors. At the trial, it was left to the jury to say whether the deed was made with an actual intent to defraud other creditors, and they found it was not. On motion made, in the court of king's bench, to set aside the verdict, it was insisted that the conveyance was fraudulent, under the statute 13 Elizabeth, ch. 5, against alienations, with intent to defraud creditors. But the conveyance was upheld, because no actual fraud had been found by the jury. The judges, Lord KENYON, BULLER, ASHHURST and GROSE, delivered their opinions seriatim, and all of them agreed that the question turned on the intention to defraud the creditors not provided for. According to the doctrine I am endeavoring to refute, the statute against personal uses, for the benefit of the grantor, would have been entirely decisive. That statute had then been in force three hundred years, but neither the counsel, *Page 118 
who were some of the ablest at the English bar, nor the judges so much as alluded to it. The judges conceded that the reservation, in favor of the grantor, could be reached in equity by creditors, and although that was denied afterwards (2 Anstruther, 381), it would not for an instant be doubted with us, especially since the statute (2 R.S., 173, § 38) in relation to creditors' bills. The decision in Estwick v. Caillaud was repeatedly examined by judges, both in the supreme court and the court of errors, in the cases I have cited; but its soundness in principle and result was not questioned, except in one instance by a senator, who assailed the result but not the principle on which it turned. (20John., 448; 5 Cow., 562, 569, 582; 15 John., 585; Hopk.,
397; 2 John. Ch. R., 580.)
Two cases in this court, later than Goodrich v. Downs, have been referred to as affording some sanction to the doctrine there laid down. These are Barney v. Griffin (2 Comst. 365);Leitch v. Hollister (4 Comst., 214). The first of these cases arose upon an assignment by an insolvent debtor of all his property, consisting of real estate only. The deed was held fraudulent and void. Judge BRONSON, it is true, observed that "the question (of fraud) was considered upon authority inGoodrich v. Downs," and added, "we think the case was well decided." I have already observed, in effect, that the decision may stand without resting it upon the particular doctrine which we are now considering. In Leitch v. Hollister (4 Comst.,
214), the assignment was held good. In sustaining that assignment, Judge GARDINER made some observations which appear to sanction this doctrine, but the case did not call for them.
In short, the doctrine, it is believed, rests upon no authority except the one which has been commented on. Before that decision, many cases, as we have seen, had arisen upon similar instruments, and an arduous contest was maintained in the courts, as will appear in the cases which have been cited, upon the question whether those instruments were to *Page 119 
be condemned as made with intent to defraud creditors. The decisions had fluctuated according to real or supposed difference in the facts. But if the statute of personal uses (I use the term for convenience) had anything to do with the subject, there was no room for such a contest. It furnished a simple unvarying rule of decision, and all questions of intention were wholly irrelevant. The absence of all reliance upon this statute, even of allusion to it except in a single instance, would seem to prove conclusively that it has more recently been misapprehended.
Upon what principle can this doctrine be maintained? If it can be, the question may be asked, how can any mortgage of chattels to secure a creditor stand, however free from all imputation of fraud? It is extremely well settled that such a mortgage passes the legal title to the mortgagee. (Butler v. Miller, 1Comst., 500; Mattison v. Baucus, id. 296.) It is moreover true, that these instruments uniformly contain one or more reservations for the benefit of the grantor. Sometimes the possession of the chattle is reserved until default, always the surplus of its value or proceeds after paying the debt. We have, then, literally "a trust for the use" of the grantor, yet no one ever thought of impeaching these securities under the statute of personal uses. They have often been held fraudulent in fact, but were never condemned on any other ground. If this statute applies to them, then they may be wanting in all the usual badges of fraud; even the possession may be delivered to the mortgagee, still they are void, because they contain a trust for the grantor after the debt is paid.
Singular, indeed, are the consequences to which this doctrine must lead. A man may be worth $1,000,000, owing one-tenth of that sum to each of two creditors. If he makes a mortgage upon or puts in trust some of his stock or other personal estate to secure one of them, with whatever motive, the transaction is void unless he secures the other also in the same instrument; although the debt unprovided for is ten *Page 120 
times secure upon the residue of his estate. Indeed, although each creditor is specially secured by separate instruments, each may insist that the security of the other is void. Judge BRONSON was clearly right in saying that this statute does not deal with intentions. It most assuredly deals with no extrinsic facts. The error, I think, is in supposing that it applies at all to transactions where the reservation to the debtor is merely the incident, instead of being the whole or main object of the conveyance.
I think it may be laid down as a proposition, nearly, if not quite self-evident, that the mere expression of a trust, when the law implies one, if not expressed, cannot, of itself, avoid a conveyance otherwise good. "Expressio eorum quæ tacite insuntnihil operatur," is a maxim of unquestionable soundness. It cannot be unlawful to stipulate for that which the law provides. The doctrine, then, which has been contended for, must go farther or it must fall to the ground. It must include conveyances of personalty, although the resulting trust be not expressed; in short, all conveyances not absolute in their intention, if there be creditors existing or subsequent.
But, contrary to all this, it has been many times held that the actual expression of a trust, which the parties really intended, saved instead of condemned the instrument. Secret trusts, attending conveyances absolute in terms, have always been regarded as a badge of fraud since the celebrated case of Twyne
(3 Coke, 80). Even the continued possession of chattels by a vendor or mortgagor, usually regarded as evidence of a fraudulent trust, has been considered, in many adjudged cases, innocent, if it was provided for in the terms of the conveyance; in other words, if in its very language it expressed a trust for the use of the debtor. See cases on both sides of this question:Sturtevant v. Ballard (9 John., 337); Divver v.McLaughlin (2 Wend., 596); Bissell v. Hopkins (3 Cow.,
166); and many others cited in Hare Wallace's note to Twyne'scase (43 Law Lib., 41). In the numerous *Page 121 
authorities upon this point, the controversy has always been whether a declared trust did not protect and uphold the transfer, and in no one of them was it ever suggested that instead of saving, such a trust absolutely condemned it. Such a controversy could never arise if instruments made for lawful purposes, and upon lawful considerations in other respects, but reserving some incidental use or benefit to the person who made them, are within this statute of uses. The case cited of Sturtevant v. Ballard
(9 Johns., 337), may be selected among many others as eminently instructive. There the debtor, between judgment and execution against him, executed a bill of sale of the tools belonging to his trade as a blacksmith, upon a fair consideration, consisting of cash advanced and a prior debt, but with an express reservation in the writing that he was to have the use of a portion of the tools for three months. Here most clearly was a case where the title passed upon a sufficient consideration, but with a perfectly well defined trust for the use of the debtor. Upon the most elaborate consideration, the transfer was held to be void, upon the principles of the common law and the statute against alienation with intent to defraud. If it had ever been supposed that the other statute, the particular one now under consideration, had anything to do with the question, it surely would have been known to the consummate learning of chancellor, then Chief Justice KENT. But we find no allusion to it. On the contrary, the chief justice stated the great point to be "whether the fact of permitting the vendor to retain possession of the goods did not render the sale fraudulent in law, notwithstanding such possession was inserted in the deed as a condition of the contract." He further observed that the reservation appearing on the face of the writing did not "necessarily" render it valid. According to the doctrine urged in the present case, it rendered the sale necessarily void.
What then is the true meaning of the statute? It declares that "all deeds of gift, all conveyances, all transfers or assignments, *Page 122 
verbal or written, of goods, chattels, or things in action, made in trust for the use of the person making the same, shall be void as against creditors, existing or subsequent, of such person." All reasoning and all authority, as we have seen, concur in the conclusion that it has no application to cases of real and actual alienation upon valuable consideration and for active and real purposes, although incidental benefits are reserved to the grantor. There is but one other possible interpretation, and that is the one to which the language itself points. It is the deed,c., to the use of the grantor, which is void, and not the deed to other uses and for other objects. Its true name should be a statute of personal uses. Its object is to render simply ineffectual, purely nominal transfers of personal estate where the entire use and control are, by a declaration of trust in or out of the instrument, left in him who makes the transfer. Its policy is not unlike that of the statutes concerning passive uses or trusts in lands which have had, along with this, a contemporaneous existence for some centuries. It is not, in any proper sense, a statute against frauds, although fraudulent practices may have led to its enactment; but it is founded on the self-evident principle that a man's property should pay his debts, although he has vested a nominal title in some other person. For that purpose the statute declares the title to be in the debtor, and no transfer which is entirely nominal can stand in the way. It has no reference to intentions, whether fraudulent or honest. There may, in fact, be no creditors until long after the transaction, but if the debtor has property they are entitled to be paid. The simple inquiry is whether the property belongs to the debtor, not upon a theory of fraud and against the terms of his conveyance, but upon a theory of equitable title reserved to himself by the very conveyance which transfers the legal and nominal title to another. If this is not altogether a misconstruction of the statute, the conclusion must be that it has no application to mortgages, trusts or other instruments *Page 123 
created to raise money or secure a creditor. It is the necessary incident of all such transactions that some beneficial interest remains in the debtor, and that the whole belongs to him when he has discharged the obligation; and, if parties cannot express in words the actual nature of the dealing without defeating their whole intention under this statute, then some of the most ordinary transactions in life cannot be carried on at all except by concealments, which the law justly pronounces to be badges of dishonesty.
This statute, then, only avoids conveyances, c., which are wholly to the use of the grantor. If we came to a different conclusion, if we held that it applied to transfers made for other objects, but containing a residuary interest or partial use for the debtor, then the question would arise whether the whole is void, or only so much of the grant as is not sustained by the valid purposes for which it was made. On this point I should come to the conclusion that the statute does not subvert all instruments in which any inoperative trust is expressed along with others that are good, but leaves those which are good and valid to stand. This question belongs purely to the construction of terms. If a statute in terms declares an entire conveyance void which has in it one such element, then it is all void because the legislature has chosen to make it so, but it is not void upon any other principle of law. If a deed is made with some evil intent, whether such intent is denounced by the common law or by a statute, then it is true the whole is void, because the whole is pervaded by a single vice. But a particular provision may be simply void or inoperative, either by common law or by statute, and all the others good. This is the true rule, where the question arises upon a statute simply declaring voidness, unless the declaration, in the strictest terms, embraces the whole instrument. Now, trusts in personal estate, for the use of the person who creates them, are not illegal or criminal, unless they are made with fraudulent motives. In themselves they are entirely innocent. They are simply declared *Page 124 
inoperative and void as to creditors. This does not affect the valid trusts unless the declaration is broad enough to include them also.
Is it, then, the necessary construction of this statute that all the trusts, which in themselves are valid, must fail because in the same conveyance there is one perfectly innocent in its nature, but void when the superior rights of creditors are concerned? I think not. A single deed may have a "conveyance," a "transfer" or an "assignment" upon a valid trust, and another upon a void one. The terms used do not, by inevitable construction, apply to the instrument in which the void use is contained. They are satisfied by applying it to the inoperative provision only. For this there is authority directly in point. InDoe v. Pitcher (6 Taunt., 363), the question was elaborately considered upon a statute containing the same terms as this, with others also. That case not only affirms the construction I have indicated, but contains an unanswerable refutation of the maxim "void in part void in toto," or rather of the uses to which that maxim has sometimes been very inaccurately applied. Without pursuing this question further, the following additional authorities may be referred to: Collins v.Blantern (2 Wilson, 348); Pigott's Cases (11 Coke, 27);Darling v. Rogers (22 Wend., 487); Patterson v. Jenks
(2 Peters, 235); Norton v. Simmes (Hobart, 12 c);Mackie v. Cairns (5 Cow., 564, per SUTHERLAND, J.).
III. The remaining objection to the trusts is, that they were made with intent to hinder, delay or defraud creditors, and are therefore void under the statute against fraudulent alienations, and by the principles of the common law, which that statute merely affirms. It is scarcely claimed that there are any facts, out of the trust deeds, to sustain the allegation of fraud, and it will be found that the general features of the case point with great clearness to an opposite conclusion.
This company was certainly in a situation of extreme embarrassment, and even of great peril. It might possibly *Page 125 
have been wiser, in reference to all results, near and remote, to have made no attempt to meet its debts at maturity, and to have gone at once into liquidation. The scheme of raising money embraced in these trusts may have been in itself cumbrous and expensive. These inquiries are not material. We cannot close our eyes to the great fact that extrication from embarrassments by raising means for paying creditors, whenever and as fast as their demands became due, was the very end sought to be attained. It may be confidently asserted that no fraudulent debtor ever resorted to such an expedient. Fraudulent debtors have always been accused of a design to evade payment, by some trust or assignment withdrawing their property from the reach of process. The gravest allegation made against this company is, that it made an unwise attempt to meet all its payments with punctuality. More than a year afterwards it was forced into liquidation, but in the meantime it struggled on and paid until it could pay no longer. When the aid derived from the trusts was spent, its condition became more and more hopeless. But it is difficult to believe that a debtor ever borrowed money to pay debts, upon a special security, fairly constructed as to its nature and amount, with an actual design of defrauding his existing creditors.
If fraudulent motives cannot be imputed to the mere act of borrowing in order to pay debts, as most clearly it cannot, we are to inquire whether the allegation can be sustained because a trust, rather than some other instrument, was selected as the mode of security. I speak now of the general and essential nature of the trust as a security, and not of its particular provisions. We are to observe that the property embraced in the trusts consisted wholly of choses in action, and therefore it was never liable to legal process. The trusts, therefore, did not withdraw it from execution, and as to the residuary interest in the fund, that could be reached in equity precisely as it could be if the transaction had been put in any other form. A direct pledge or mortgage was *Page 126 
clearly impracticable, and in principle there is clearly no reason for saying that either of those modes of assurance should have been resorted to rather than a trust deed. Any one of these forms would necessarily encumber a portion of the corporate estate, but if that was unlawful, then borrowing and lending upon security must cease when the borrower is already in debt.
I repeat, that, so far as any question of fraud is concerned, it was indifferent whether the company secured the proposed loans by a pledge, a mortgage or a trust. In Leitch v. Hollister (4Comst., 211), this court sustained an assignment, by a debtor, of a chose in action, to several of his creditors jointly, to secure their separate demands, but reserving the surplus to himself. It was not, like these trusts, a security for raising money to pay all debts, but a preferential assignment to secure a party only, with no provision for the residue. Judge GARDINER, delivering the opinion of the court, seems to have considered the instrument as a mortgage; which may well be doubted. But the distinction was plainly of no value, as will be seen from his remarks. He observed: "The property assigned was a chose in action. The complainant acquired a lien upon the interest of the assignor the moment his bill was filed. He was then at liberty to redeem or require a sale, subject to the rights of the respondents [the assignees], or compel an application of the surplus upon his own debt." "He has, therefore, not been hindered or sustained any injury other than that he has been postponed to other creditors equally meritorious with himself." This reasoning, which appears to be entirely sound, obliterates all possibility of distinction, upon a question of fraud, between a trust and any other instrument, where, either from the nature of the security or of the property, the debtor's interest can be reached in equity only. It cannot be said that a trust withdraws property from execution at law which was never liable to it; and as to the equitable remedy, that is the *Page 127 
same, whether the property is encumbered by a technical trust, a mortgage or a pledge.
The question of fraud, then, so far, stands thus: The company intended and hoped to pay its debts and go on with its business. To that end it determined to borrow a million and then a half million of dollars. In all this there may have been delusion and folly but clearly no fraud. It also determined to secure the loans by trust deeds conveying to trustees a certain portion, suitable in amount, of the securities for money which it possessed and which could not otherwise be realized in cash; and we have also seen that this was a mode of proceeding in principle quite as unobjectionable as any other. Where, then, it may be asked, is the fraud, so long as the law allows a debtor, in the hope of paying his debts, to borrow money and give a special security for the loan?
But the argument on this question was understood to rely upon special reservations in the deeds for the benefit of the company. Instruments containing such reservations in favor of debtors have been so often set aside that unless we discriminate we are liable to conclude that they are fraudulent and wrong in their own essential nature. This is entirely a mistake. In and of themselves they are perfectly innocuous. A man proposing to create a security upon his estate, or to assign it upon any trust, has a plain right in general to reserve to himself just such interests and benefits as he and those with whom he is dealing can agree upon. The law upon this subject is entirely adapted to the dealings of mankind. If the owner makes a purely nominal conveyance of his personal estate, reserving to himself the entire use, then there is no reason of convenience or necessity for giving any effect to the transaction. It is simply ineffectual, without regard to motives. On this idea is founded the statute of personal trusts where the use is wholly to the grantor. But in the business of every trader exigencies will arise requiring a pledge, a mortgage or some other assurance less than an *Page 128 
absolute sale, founded on some actual dealing, the very nature of which implies that some residuary or partial interest remains. Such instruments must, in the very necessity of things, take effect according to their terms, and the law, therefore, gives them effect. It permits most assuredly an inquiry into motives; but as such transactions are in their nature innocent, it pronounces no judgment that they are fraudulent until the fraud is made to appear. To say that such assurances are ever fraudulent in law, is an inaccurate use of language. If they were so, then the law would in all cases defeat what it most certainly tolerates, and dealings of every day's occurrence would be void. Where besides the reserved benefits, certain other facts appear, and only then, the law may declare a presumption of fraud, and this is the full extent to which it goes.
These principles, which are elementary, may be illustrated by the trust deeds now in question. We may take the million trust, as the two are alike. It declares that this company has issued its bonds for sale, in England, to the amount of $1,000,000; that the company, actuated by a desire to secure the payment of said bonds to the holders, has transferred certain specific securities, set forth in a schedule, to certain trustees for that purpose; and thereupon the trustees agree that they will hold such securities for such purpose. Then follows a provision that the securities shall be held in trust for the company until default in paying interest or principal upon the bonds, which is plainly limited, however, in the same sentence, to a trust for the mere purpose of allowing the company, until such default, to receive the interest accruing on the securities pledged. Then follow appropriate powers given to the trustees, to be exercised, after default, in converting the estate assigned and applying the proceeds to the payment of the bonds, among which are powers to raise money by a sale or borrow it by a pledge of the securities assigned. Inasmuch as moneys might become due on the securities during the existence of the trust, the *Page 129 
trustees are very properly authorized to make the needful collections, to be reinvested in other similar securities. The final trust declared is to return the fund to the company or hold it subject to its order after the million bonds are paid. This is the whole scheme, as disclosed in the trust deed, and what does it show? Simply, that this company, wishing to borrow a million of dollars, for that purpose issued its nine hundred bonds, and placed in trust specific securities for their payment. In this there is plainly no appearance of fraud upon creditors, for the instrument does not disclose that there were any. On its face the transaction is entirely free from objection, so far, I mean, as questions of fraud are concerned. The several details, so far as I am able to judge, are precisely adapted to the end in view; no one of them will justify a suspicion of any other view. As to the reservations for the use of the corporation, so far from being extraordinary, it would be extraordinary if they had not been inserted. The important one is the final trust to return the fund to its author. But what else should be done with it, when there was no longer any reason for keeping the trust in existence? If the parties had not so stipulated, the law would have so declared. The only answer which can be suggested is, that the instrument should have gone further, and declared other trusts devoting the fund, except so far as pledged to the bondholders, to the payment of existing debts. But to this the reply is, that the company was not proposing to wind up its affairs and assign for the benefit of its creditors. The suggestion of further trusts for creditors is inconsistent with the nature and objects of the transaction. The scheme was not to secure creditors, any one or all of them, by an insolvent assignment, but to obtain money and pay them all. When we look out of the trust deed, as we must, in order to find any fact on which to base a suspicion of fraud, we find a distinct and well-defined plan for going on with business and paying debts. We may charge infatuation *Page 130 
and folly; but we cannot charge fraud. That element cannot be found either in the instrument or out of it.
These trusts, then, although unusual in their magnitude, so far as any question of principle is concerned, belong to an innumerable class of dealings which take place in all communities where people engaged in various pursuits of life borrow money upon special security. The obnoxious feature is supposed to be in reserving uses and benefits out of the estate pledged; but it has not been contended that men and corporations cannot borrow money for legitimate uses, upon a pledge of property, without, at the same time, declaring further trusts in favor of their creditors. Yet to that result the argument against these trusts inevitably comes.
If this corporation had contemplated insolvency and a closing up of its concerns, and we were able to say that through the reservations in the trust deeds, it intended to tie up and place beyond the reach of its creditors any portion of its effects for its own use, then we might pronounce them fraudulent. But these conclusions would be directly contrary to the facts of the case. The danger of insolvency may have been very great, but we know it was not in fact contemplated. The corporation was forced into liquidation more than a year afterwards. It could not have intended to reserve a fund for its own use in defiance of creditors, for it is impossible to say that securities were pledged to any greater amount than was imperatively required in order to obtain the loans proposed. And there is a further difficulty in the way of imputing such a design. In what way, it may well be asked, could this corporation fraudulently set aside a fund and use it, in a state of insolvency, with its creditors kept at bay? The difficulty is in inventing some mode of corporate existence, sustained only by a reserved fund, with its creditors unpaid. Private debtors often resort to such expedients, and sometimes live in splendor on estates which justly belong to their creditors. Now, I suppose that an artificial being may, in judgment of law, intend to defraud *Page 131 
its creditors. But this company was an incorporated bank (so it has been assumed throughout), and its very life depended on the punctual payment of its debts. When it ceased to pay, it ceased to exist. It could not prolong its operations for a single day, and it could have no possible use for a fund fraudulently kept from the reach of its creditors. Before a fraudulent intent can be imputed, it seems to me that some possible mode of using and enjoying the fund reserved, while creditors remained unpaid, should be suggested.
It can only be necessary to observe, further, that all the cases relied upon in support of this objection, are distinguishable by features which are fatal to the analogy supposed. The leading cases cited are Mackie v. Cairns (5Cow., 549); Grover v. Wakeman (11 Wend., 187); Goodrich
v. Downes (6 Hill, 440); Barney v. Griffin (2 Comst.,
365). In all these, and in all others of the class, it will be found that the assignor was an insolvent or failing debtor. In none of them was it the design or purpose of the instrument to raise money and pay debts. In all of them the assignment was of itself an act of voluntary bankruptcy, and not, as here, a scheme to raise money in a crisis for the very purpose of averting bankruptcy. In those cases the insolvent or failing debtor conveyed the whole, or the mass of his estate, either for the benefit of only part of his creditors, leaving the other portion unprovided for, either in the trust or in other property not assigned, or, if all were provided for, it was only done on condition of a release or some other benefit to the assignor. In some of them the claims of creditors were made expressly subject to a reservation for the support of the debtor and his family. In others, while a part of the creditors were not embraced in the trust, the surplus of the estate was reserved to the debtor. But it may be safely affirmed that no decision was ever made annulling a conveyance solely and merely on the ground that it contained provisions in favor of the grantor. In themselves we have seen that such provisions are lawful, *Page 132 
and that they enter of necessity into all dealings between the borrower and lender on security. But when they are made in favor of an insolvent, who winds up his affairs by an assignment of his whole estate, then they have been justly regarded as high and sometimes conclusive evidence of a fraudulent design.
The principle, indeed, which runs through this whole branch of our law, is, that when a trader or dealer fails, and proposes to put his estate in trust, he must devote the whole of it, immediately and unconditionally, to the payment of his debts. It is only on those terms that he is allowed to withdraw it from the ordinary process of the law. He must reserve nothing to himself, but must give all to his creditors. The principle is sound, but it is not to be applied to transactions of a totally different nature. It is not a principle which interferes in the honest arrangements which a person in debt may make to remove present embarrassments and go on in business. He may, like other men, in good faith, mortgage, pledge or put in trust his estate or a portion of it to raise money for such purposes, and when he does so, all the accustomed forms of dealing require that the uses of the conveyance should be declared, including the reversion to himself after the obligation is discharged. Such was the real nature of these trusts, and I can see no more reason for applying the principle stated to them than to the common transaction of pledging shares of stock to obtain at a bank the discount of a promissory note.
Having now examined all the objections, my conclusion is that the million and half million trusts are legal and valid; and that the several holders of the bonds are entitled to be paid out of the property and funds embraced in those trusts.
This is a conclusion which necessarily affirms the validity of the debt of the Palmers Co., who are, as we have seen, pledgees of a portion of the bonds. The principles involved in that branch of the case were considered by this court in the case of TheState of Indiana, and they are also now discussed *Page 133 
in the opinions of some of my brethren. The judgment of the supreme court must be affirmed, with some modifications, which will slightly reduce the amount of the Palmers' debt.
JOHNSON and BOWEN, Js., concurred in this opinion, in respect to the propositions adopted by the court, which will be found at the close of the opinions, post.